1

Matthew J. Preusch (CSB No. 298144)
**KELLER ROHRBACK L.L.P.**

2

801 Garden Street, Suite 301
Santa Barbara, CA 93101

3

(805) 456-1496, Fax (805) 456-1497
mpreusch@kellerrohrback.com

4

***Attorney for Plaintiffs***
*[Additional counsel listed on signature page]*

5

6

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF CALIFORNIA

7

SAN FRANCISCO DIVISION

8

CURTIS BRIGHT, WILLIAM GRIFFITT,
DESMOND RAINS, IVAN TELLEZ, and

No.

9

KEVIN THOMAS on behalf of themselves and
all others similarly situated,

**COMPLAINT – CLASS ACTION**

**JURY DEMAND**

10

Plaintiffs,

V.

11

FORD MOTOR COMPANY,

12

Defendant.

13

14

15

16

17

18

19

20

21

i

**TABLE OF CONTENTS**

I.      INTRODUCTION ................................................................................................. 1

II.     PARTIES ............................................................................................................. 3

        A.      Defendant Ford Motor Company ........................................................... 3

        B.      Plaintiff Curtis Bright (Washington) .................................................... 4

        C.      Plaintiff William Griffitt (Oklahoma) ................................................... 5

        D.      Plaintiff Desmond Rains (Oregon) ....................................................... 5

        E.      Plaintiff Ivan Tellez (California) ........................................................... 7

        F.      Plaintiff Kevin Thomas (Kentucky, North Carolina) ........................... 8

III.    JURISDICTION AND VENUE ......................................................................... 8

IV.     FACTUAL ALLEGATIONS ............................................................................ 10

        A.      Ford Marketed the Affected Vehicles as Tough, Safe, and Reliable ................ 10

                1.      Ford Marketing Emphasized a GVWR That Was Only Possible
                        Because of the Roof Defect ....................................................... 13

                2.      Ford Marketed Safety Features that the Roof Defect Rendered
                        Ineffective ................................................................................. 17

        B.      The Roof Defect .................................................................................... 20

                1.      Roof Cab Safety is a Critical Component of Vehicle Safety ................ 20

                2.      The Roof Defect Severely Impacts the Safety of the Affected
                        Vehicles ..................................................................................... 22

        C.      Ford Knew of the Roof Defect when it Sold the Affected Vehicles ................ 22

        D.      The Affected Vehicles are No Longer Covered by Ford's Vehicle
                Warranties ............................................................................................. 25

V.      CLASS ACTION ALLEGATIONS .................................................................. 25

        A.      Class Definitions .................................................................................. 25

        B.      Class Certification Requirements. ....................................................... 27

VI.     EQUITABLE TOLLING ................................................................................... 29

        A.      Discovery Rule Justifies Tolling .......................................................... 29

B. Fraudulent Concealment Justifies Tolling. 30

C. Estoppel Justifies Tolling. 30

VII. CLAIMS FOR RELIEF 31

A. Claims Brought on Behalf of the Nationwide Class 31

COUNT ONE — COMMON LAW FRAUD – AFFIRMATIVE MISREPRESENTATION (as to the 2011–16 Class Vehicles) 31

COUNT TWO — COMMON LAW FRAUD – FRAUDULENT CONCEALMENT/FRAUD BY OMISSION 32

COUNT THREE — VIOLATIONS OF THE MAGNUSON–MOSS WARRANTY ACT (15 U.S.C. § 2301, et seq.) 33

COUNT FOUR — UNJUST ENRICHMENT 35

B. Claims Brought on Behalf of the California Subclass 36

COUNT FIVE — VIOLATIONS OF THE CALIFORNIA UNFAIR COMPETITION LAW 36

COUNT SIX — VIOLATIONS OF THE CALIFORNIA FALSE ADVERTISING LAW 37

COUNT SEVEN — VIOLATIONS OF THE CALIFORNIA CONSUMER LEGAL REMEDIES ACT 39

COUNT EIGHT — **BREACH OF THE IMPLIED WARRANTY OF MARCHANTABILITY (CAL. COM. CODE §§ 2314 AND 10212) 41**

C. Claims Brought on Behalf of the Kentucky Subclass 47

COUNT TWELVE — BREACH OF THE IMPLIED WARRANTY OF MERCHANTABILITY (KY. REV. STAT. §§ 225.2-314 AND 355.2A-212) 47

COUNT THIRTEEN — FRAUD BY CONCEALMENT 48

COUNT FOURTEEN — UNJUST ENRICHMENT 49

D. Claims Brought on Behalf of the North Carolina Subclass 50

COUNT FIFTEEN — VIOLATION OF THE NORTH CAROLINA UNFAIR AND DECEPTIVE TRADE PRACTICES ACT (N.C. GEN. STAT. §§ 75-1.1, et seq.) 50

COUNT SIXTEEN — BREACH OF THE IMPLIED WARRANTY OF MERCHANTABILITY (N.C. GEN. STAT. §§ 25-2-314 AND 252A-212) 52

COUNT SEVENTEEN — FRAUD BY CONCEALMENT ....................................... 53

COUNT EIGHTEEN — UNJUST ENRICHMENT .................................................... 54

    E.      Claims Brought on Behalf of the Oklahoma Subclass....................................54

COUNT NINETEEN — VIOLATION OF THE OKLAHOMA CONSUMER
     PROTECTION ACT (OKLA. STAT. TIT. 15 § 751, et seq.) .........................54

COUNT TWENTY — BREACH OF THE IMPLIED WARRANTY OF
     MERCHANTABILITY (OKLA. STAT. TIT. 12A §§ 2-314 AND 2A-
     212) ........................................................................................................... 56

COUNT TWENTY-ONE — FRAUD BY CONCEALMENT .................................. 57

COUNT TWENTY-TWO — UNJUST ENRICHMENT ............................................ 58

    F.      Claims Brought on Behalf of the Oregon Subclass .........................................58

COUNT TWENTY-FIVE — FRAUD BY CONCEALMENT.................................. 61

COUNT TWENTY-SIX — UNJUST ENRICHMENT............................................... 62

    G.     Claims Brought on Behalf of the Washington Subclass ..................................63

COUNT TWENTY-SEVEN — VIOLATIONS OF THE  CONSUMER
     PROTECTION ACT (REV. CODE WASH. ANN. §§ 19.86.010, ET
     SEQ.).......................................................................................................... 63

COUNT TWENTY-EIGHT — BREACH OF THE IMPLIED WARRANTY OF
     MERCHANTABILITY (REV. CODE WASH. § 62A.2-314/315) ................. 64

COUNT TWENTY-NINE — FRAUD BY CONCEALMENT.................................. 65

COUNT THIRTY — UNJUST ENRICHMENT ........................................................ 66

VIII.   PRAYER FOR RELIEF ................................................................................ 66

IX.    DEMAND FOR JURY TRIAL.......................................................................67

## I.      INTRODUCTION

1.      Plaintiffs Bright, Griffitt, Rains, Tellez, and Thomas bring this action on behalf of themselves and all others similarly situated against the Ford Motor Company ("Defendant"). Plaintiffs allege the following based upon information and belief, the investigation of counsel, and personal knowledge as to the factual allegations pertaining to themselves.

2.      This putative class action arises out of a design defect in certain Ford Super Duty pick-up trucks. These trucks have a roof designed to withstand less than the weight of the vehicle—meaning that in the event of a rollover accident, the roof structure can collapse and seriously injure or kill vehicle occupants.

3.      The frame of a vehicle is the "foundation of strength and toughness" according to Ford Motor Company ("Ford" or "Defendant").[1] Now, Ford touts the "only high-strength, military-grade, aluminum-allow body in its class" in marketing its Super Duty pick-up trucks. However, until the 2017 model year, Ford's Super Duty trucks had a dangerously weak roof structure susceptible to collapse in the event of a roll-over accident, which can and has seriously injured or killed vehicle occupants. Ford knew of the danger, but did nothing to rectify the dangerously weak roof structure, instead lobbying against rule changes that would have increased roof-strength requirements and continuing to market the Super Duty trucks as safe, tough, and best-in-class.[2]

4.      Model year 1999–2016 Ford Super Duty pick-up trucks (hereinafter the "Affected Vehicles" or "Vehicles") have a roof design that is insufficient to support the weight of the vehicles, causing the roofs to be crushed in the event of a rollover accident (the "Roof Defect"). This can result in serious injury or death to occupants of the vehicle in the event of a rollover accident.

---

[1] *Super Duty*, Ford, **https://www.ford.com/trucks/super-duty/#precollisionassitwith1** (last visited Oct. 3, 2022).
[2] *See, e.g.*, 2015 Ford Super Duty, **Exhibit A**.

1

5.      Plaintiffs and similarly situated vehicle owners and lessees are now left with Vehicles that may seriously injure or kill them and their passengers in the event of a rollover accident.



6.      Due to the undisclosed Roof Defect, Plaintiffs and Vehicle Owners and Lessees were deprived of the benefit of their bargain in purchasing or leasing the Vehicles; further, Plaintiffs and Vehicle Owners and Lessees suffered an ascertainable loss of money, property, and/or resale value of their Vehicles. Plaintiffs bring this action individually and on behalf of all other current and former owners or lessees of the Vehicles. Plaintiffs seek injunctive relief, monetary damages, and other equitable relief for Ford's misconduct related to the design, manufacture, marketing, and sale of the Vehicles as alleged in this Complaint.

7.      Despite their knowledge, Ford failed to notify Plaintiffs and Vehicle Owners and Lessees of the problem with the roof strength of the Vehicles at the time of purchasing their Vehicles, or at any time thereafter. Ford must buy back these dangerous Vehicles or reimburse Plaintiffs and Vehicle Owners and Lessees for the serious risk inherent in continuing to drive them.

8.      Ford has been unable to develop, implement, and deliver a repair that relieves consumers from their current unsafe and unacceptable circumstances. Even if it could do so tomorrow, Plaintiffs and Vehicle Owners and Lessees would still have suffered economic harm; had Ford disclosed the Roof Defect, consumers would have paid much less for the Vehicles, if they would have bought or leased them at all. This means that the Vehicles were, at the point of purchase and still today, far less valuable than bargained for and reasonably expected because of the Roof Defect. Consumers paid for reasonably expected value during this time period, which the Defect prevented them from receiving.

9.      Plaintiffs and vehicle owners and lessees unwittingly acquired life-threatening risk when acquiring their Vehicles, which they would not have voluntarily assumed either at all or without compensation. As evidence of this risk, Ford subsequently changed the roof design in its Super Duty vehicles to increase the roof strength. The undisclosed Roof Defect in 1999–2016 Super Duty pick-up trucks is Ford's responsibility to fix.

## II.     PARTIES

### A.     Defendant Ford Motor Company

10.     Defendant Ford Motor Company ("Ford") is a Delaware limited liability company. Ford's principal place of business and headquarters is One American Road, Dearborn, Michigan 48126.

11.     Ford, one of the "Big Three" American automakers, is a motor vehicle manufacturer and distributor of new, previously untitled Ford and Lincoln motor vehicles under its Ford and Lincoln brands.

12.     Ford, including its subsidiaries and joint ventures, designs, manufactures, markets, distributes, and sells automobiles throughout the U.S. and worldwide. Ford and its agents designed and manufactured the Roof-Crush Defect Vehicles. Ford also developed and disseminated the owner's manuals and warranty booklets, advertisements, brochures, and other promotional materials relating to the Roof-Crush Defect Vehicles, with the intent that such documents be purposely distributed

throughout all fifty states and the District of Columbia. Ford is engaged in interstate commerce, distributing vehicles for sale through its dealer network throughout the United States.

13.     Ford authorizes automobile dealerships to sell Ford automobiles and to disseminate vehicle information provided by Ford to customers. Furthermore, Ford's nearly 10,000 authorized dealers served as its agents for warranty claims and related motor vehicle repairs because these dealers perform repairs, replacements, and adjustments covered by Ford's manufacturer warranty under contract with Ford.

**B.      Plaintiff Curtis Bright (Washington)**

14.     Plaintiff Curtis Bright is a citizen and resident of Graham, Washington.

15.     He purchased a new 2000 Ford Super Duty Extended Cab truck in October 1999, for $31,000 from Titus Will Ford in Tacoma, Washington. Plaintiff Bright's Ford Super Duty Extended Cab is a Class Vehicle equipped with the defective roof.

16.     Plaintiff Bright made the decision to purchase the Ford Super Duty Extended Cab after considering Ford's representations about the safety and durability of the Vehicle.

17.     Prior to his purchase, neither Ford nor any of its agents, dealers, or other representatives informed Plaintiff Bright of the Roof Defect. Plaintiff Bright reasonably expected that the Vehicle would function normally in accordance with Ford's specifications and representations.

18.     Plaintiff Bright purchased the Vehicle for personal, family, and household use. Plaintiff Bright has always attempted to use the Vehicle in the normal and expected manner.

19.     Plaintiff Bright is concerned about the safety of driving his Vehicle, and must now choose between his own personal safety and that of his passengers, and his ability to use the Vehicle that he paid for.

20.     Plaintiff Bright has suffered an ascertainable loss resulting from Ford's fraud, omissions, and refusal to correct the Roof Defect, and did not receive the benefit of his bargain when he purchased the Vehicle. Had Plaintiff Bright known of the Roof Defect, he would not have purchased his Vehicle.

4

**C.     Plaintiff William Griffitt (Oklahoma)**

21.     Plaintiff William P. Griffitt is a citizen and resident of Grove, Oklahoma.

22.     He purchased a 2000 F-250 Super Duty Lariat on March 1, 2018, in a private party transaction for approximately $5,000. Plaintiff Griffitt's F-250 Super Duty Lariat is a Class Vehicle equipped with the defective roof.

23.     Plaintiff Griffitt made the decision to purchase the F-250 Super Duty Lariat after considering Ford's representations about the safety and durability of the Vehicle.

24.     Prior to his purchase, neither Ford nor any of its agents, dealers, or other representatives informed Plaintiff Griffitt of the Roof Defect. Plaintiff Griffitt reasonably expected that the Vehicle would function normally in accordance with Ford's specifications and representations.

25.     Plaintiff Griffitt purchased the Vehicle for personal, family, and household use. Plaintiff Griffitt has always attempted to use the Vehicle in the normal and expected manner.

26.     Plaintiff Griffitt is concerned about the safety of driving his Vehicle, and must now choose between his own personal safety and that of his passengers, and his ability to use the Vehicle that he paid for.

27.     Plaintiff Griffitt has suffered an ascertainable loss resulting from Ford's fraud, omissions, and refusal to correct the Roof Defect, and did not receive the benefit of his bargain when he purchased the Vehicle. Had Plaintiff Griffitt known of the Roof Defect, he would not have purchased his Vehicle.

**D.     Plaintiff Desmond Rains (Oregon)**

28.     Plaintiff Desmond Rains is a citizen and resident of Grants Pass, Oregon.

29.     He acquired a 1999 F-350 Super Duty truck in July 2022 in a private party transaction. Plaintiff Rains's F-350 Super Duty truck is a Class Vehicle equipped with the defective roof.

30.     Plaintiff Rains previously owned a 2000 F-250 Super Duty truck, which he purchased in a private party transaction in September 2010, and a 1999 F-250 Super Duty truck, which he purchased in a private party transaction sometime before 2017 and sold in early 2022. In August 2011, his son was

driving the 2000 F-250 Super Duty truck and was involved in a collision that resulted in a rollover of the vehicle. The roof of the F-250 Super Duty truck was completely crushed during the rollover incident:



31.     Plaintiff Rains made the decision to purchase the F-350 Super Duty truck after considering Ford's representations about the safety and durability of the Vehicle.

32.     Prior to his purchase, neither Ford nor any of its agents, dealers, or other representatives informed Plaintiff Rains of the Roof Defect. Plaintiff Rains reasonably expected that the Vehicle would function normally in accordance with Ford's specifications and representations.

33.     Plaintiff Rains purchased the Vehicle for personal, family, and household use. Plaintiff Rains has always attempted to use the Vehicle in the normal and expected manner.

34.     Plaintiff Rains is concerned about the safety of driving his Vehicle, and must now choose between his own personal safety and that of his passengers, and his ability to use the Vehicle that he paid for.

35.     Plaintiff Rains has suffered an ascertainable loss resulting from Ford's fraud, omissions, and refusal to correct the Roof Defect, and did not receive the benefit of his bargain when he purchased the Vehicle. Had Plaintiff Rains known of the Roof Defect, he would not have purchased his Vehicle.

**E.     Plaintiff Ivan Tellez (California)**

36.     Plaintiff Ivan Tellez is a resident of Concord, California.

37.     He purchased a 2016 F-350 Super Duty truck on August 9, 2016, for $80,432.89 from Future Ford of Concord. Plaintiff Tellez's F-350 Super Duty is a Class Vehicle equipped with the defective roof.

38.     Plaintiff Tellez also purchased a 2000 F-350 Super Duty truck in June 2020 in a private party transaction for $12,500. Plaintiff Tellez's F-350 Super Duty is a Class Vehicle equipped with the defective roof.

39.     Plaintiff Tellez made the decision to purchase the F-350 Super Duty after considering Ford's representations about the safety and durability of the Vehicle.

40.     Prior to his purchase, neither Ford nor any of its agents, dealers, or other representatives informed Plaintiff Tellez of the Roof Defect. Plaintiff Tellez reasonably expected that the Vehicle would function normally in accordance with Ford's specifications and representations.

41.     Plaintiff Tellez purchased the Vehicle for use for his food truck business. Plaintiff Tellez has always attempted to use the Vehicle in the normal and expected manner.

42.     Plaintiff Tellez is concerned about the safety of driving his Vehicle, and must now choose between his own personal safety and that of his passengers, and his ability to use the Vehicle that he paid for.

43.     Plaintiff Tellez has suffered an ascertainable loss resulting from Ford's fraud, omissions, and refusal to correct the Roof Defect, and did not receive the benefit of his bargain when he purchased the Vehicle. Had Plaintiff Tellez known of the Roof Defect, he would not have purchased his Vehicle.

7

**F.     Plaintiff Kevin Thomas (Kentucky, North Carolina)**

44.     Plaintiff Kevin Thomas is a resident of Benton, Kentucky.

45.     He purchased a used 2002 F-250 Super Duty truck in December 2005, for approximately $23,000 from Ken Feagin Used Trucks in Asheville, North Carolina. Plaintiff Thomas's F-250 Super Duty truck is a Class Vehicle equipped with the defective roof.

46.     Plaintiff Thomas made the decision to purchase the F-250 Super Duty truck after considering Ford's representations about the safety and durability of the Vehicle.

47.     Prior to his purchase, neither Ford nor any of its agents, dealers, or other representatives informed Plaintiff Thomas of the Roof Defect. Plaintiff Thomas reasonably expected that the Vehicle would function normally in accordance with Ford's specifications and representations.

48.     Plaintiff Thomas purchased the Vehicle for personal, family, and household use. Plaintiff Thomas has always attempted to use the Vehicle in the normal and expected manner.

49.     In 2008, Plaintiff Thomas's F-250 Super Duty truck was underneath a metal carport that collapsed due to heavy snowfall. The roof of the truck was seriously damaged, and Plaintiff Thomas has been unable to repair it due to the cost. The roof of the truck was seriously damaged to the point that a full repair would exceed the resale value of the truck.

50.     Plaintiff Thomas has suffered an ascertainable loss resulting from Ford's fraud, omissions, and refusal to correct the Roof Defect, and did not receive the benefit of his bargain when he purchased the Vehicle. Had Plaintiff Thomas known of the Roof Defect, he would not have purchased his Vehicle.

### III.     JURISDICTION AND VENUE

51.      This Court has subject matter jurisdiction under the Class Action Fairness Act of 2005 ("CAFA"), 28 U.S.C. § 1332(d), because the putative class numbers more than 100, the aggregate amount in controversy exceeds $5,000,000 excluding costs and interest, and at least one plaintiff and

one defendant are citizens of different states. This Court has supplemental jurisdiction over the state law claims alleged herein pursuant to 28 U.S.C. § 1367.

52. This Court has general personal jurisdiction over Defendant because the Defendant conducted substantial business in this judicial district and intentionally and purposefully placed Class Vehicles into the stream of commerce within the state of California and throughout the United States.

53. Ford operates a Silicon Valley campus that is home to nearly 300 researchers, engineers, designers, and scientists.[3] There are over 140 authorized Ford dealerships in the state of California and together, they sold tens of thousands of class vehicles every model year. For example, California generated the second-greatest number of new F-Series registrations of any state in 2013.[4]

54. Venue is proper in this District pursuant to 28 U.S.C. § 1391 because a substantial part of the events or omissions giving rise to Plaintiffs' claims occurred in this District. Defendant has marketed, advertised, and sold the affected vehicles in this District, and otherwise conducted extensive business in this District.

55. **Divisional Assignment.** Defendant has numerous dealerships in Contra Costa county, including in Concord, CA, where Plaintiff Tellez purchased his vehicle; in Marin county, including in Marin, CA; and in San Mateo county, including in San Mateo, CA. For this reason, a divisional assignment in the San Francisco Division is proper under Civil L.R. 3-2(d).

---

[3] *Silicon Valley*, Ford Operations, **https://corporate.ford.com/operations/locations/silicon-valley.html** (last visited Nov. 7, 2022).

[4] *See California*, Ford, **https://www.ford.com/dealerships/dealer-directory/ca/** (last visited Nov. 7, 2022); Sean Williams, *The 5 Critical States Where Ford Sells the Most F-Series Pickups*, The Motley Fool (Oct. 12, 2018), **https://www.fool.com/investing/general/2014/08/17/the-5-critical-states-where-ford-sells-the-most-f.aspx** (last visited Nov. 7, 2022).

1

## IV.    FACTUAL ALLEGATIONS

2

56.    Ford markets and sells the F-Series Super Duty line of vehicles. They are heavy duty

3

trucks designed for towing, hauling, plowing, and off-road driving.[5] Ford advertises these trucks as

being "designed to put in the work."[6]

4

57.    The F-Series Super Duty line of vehicles includes the F-250, F-350, F-450, and F-550

5

pick-up trucks.[7] Until 2017, the Super Duty vehicles were built around a steel frame that was unable to

6

withstand the weight of the vehicles in the event of a rollover. Starting with the model year 2017 Super

7

Duty trucks, Ford redesigned the Super Duty trucks to include a stronger, aluminum frame.[8]

8

**A.    Ford Marketed the Affected Vehicles as Tough, Safe, and Reliable**

9

58.    Ford markets the Super Duty Vehicles as a "leader[] in the heavy-duty pickup truck

10

market."[9] In 2016, Ford boasted that the F-Series "has been the top-selling truck in the United States for

39 consecutive years."[10]

11

12

13

---

14

[5] *Frequently Asked Questions About New Ford Super Duty Trucks*, MuddleKauff Ford,
https://www.middlekauffford.com/new/ford-super-duty-frequently-asked-
questions.htm#:~:text=Super%20Duty%20means%20that%20the,more%20of%20a%20work%
20truck (last visited Oct. 7, 2022).

15

16

[6] *Id.*

[7] Beginning production in early 1998 for the 1999 model, the Ford F-Series Super Duty consisted of the
F-250 pickup truck, F-350 pickup truck and chassis cab, and introduced the F-450 and F-550 chassis
cab trucks.

17

[8] Mike Sutton, *First Drive: 2017 Ford F-series Super Duty*, Car and Driver (Aug. 2, 2016),
https://www.caranddriver.com/reviews/a15100099/2017-ford-f-series-super-duty-first-drive-
review/ (last visited Oct. 9, 2022).

18

[9] *New 2015 Ford F-Series Super Duty Will Deliver Best-In-Class Horsepower, Torque and Towing
Capacity*, Ford Media Center (Mar. 5, 2014),
https://media.ford.com/content/fordmedia/fna/us/en/news/2014/03/05/new-2015-ford-f-series-
super-duty-will-deliver-best-in-class-hor.html (last visited Oct. 9, 2022).

19

20

[10] *Ford Gives Real-World Truck Customers Insider Access to All-New F-Series Super Duty Testing*,
Ford Media Center (Jan. 27, 2016),
https://media.ford.com/content/fordmedia/fna/us/en/news/2016/01/27/ford-truck-customers-
insider-super-duty.html (last visited Oct. 9, 2022).

21

59.     The Super Duty Vehicles were consistently marketed to consumers as safe, reliable vehicles, and Ford knew that these qualities were material to consumers in marketing the Vehicles in this manner. These qualities were in fact material to Plaintiffs.

60.     For example, this 2007 ad for the 2008 F-Series Super Duty advertises the Vehicles as "Built Stronger. Built Tougher."[11]



61.     Another ad from 2008 describes the Affected Vehicles as "Built Better, to Work Harder for You" and as the "toughest, boldest, most-capable truck in America."[12]

---

[11] 2008 Ford F-Series Super Duty, **https://issuu.com/autokiosk/docs/2008-ford-f-serie-super-duty-brochure-usa** (last visited Oct. 9, 2022) [hereinafter 2008 Super Duty Brochure].

[12] *Id.*

11



62.     This marketing extended to the actual frame of the Affected Vehicles as well: a marketing brochure for the 2009 Super Duty Vehicles proclaims that the Vehicles' "muscular sheet metal wraps around an incredible strong structure."[13]



---

[13] 09 F-Series Super Duty, **https://www.motorologist.com/wp-content/uploads/2009-super-duty.pdf** (last visited Oct. 10, 2022) [hereinafter 2009 Super Duty Brochure].

1

  **1.**   **Ford Marketing Emphasized a GVWR That Was Only Possible Because of the Roof Defect**

2

  63.   From the introduction of the Ford Super Duty Vehicles, Ford has highlighted the

3

Vehicles' gross vehicle weight rating (also referred to as the "GVWR") and towing capacity. The

4

GVWR of a vehicle represents the maximum amount of weight that a vehicle can safely handle,

5

including the payload capacity.[14] A lower vehicle curb weight results in the vehicle being able to

6

withstand a higher payload capacity—in other words, the vehicle is able to be loaded with more

7

weight.[15] This incentivized Ford to make the vehicle curb weight as low as possible, which they

achieved through a dangerously weak roof frame.

8

  64.   This 1999 ad for the Ford F-450 Super Duty highlights the "Best-in-class GVWRs" of the

9

Super Duty series[16]:

10

11

12

13



14

15

16

17

---

18

[14] Ashley Bell, *What Is GVWR or Your Gross Vehicle Weight Rating?*, WeighSafe.com (Jan. 21, 2019),

19

**https://www.weigh-safe.com/towing-safety/what-is-your-gross-vehicle-weight-rating-or-gvwr/** (last visited Oct. 10, 2022).

[15] *Id.*; *see also Truck Payload Vs. Towing Capacity: What You Need to Know*, Firestone (Jan. 7, 2019),

20

**https://www.firestonecompleteautocare.com/blog/driving/truck-payload-vs-towing-capacity-what-to-know/** (last visited Oct. 10, 2022).

[16] The Nineteen Hundred and Ninety Nine Super Duty F-Series, at 5, **https://www.xr793.com/wp-content/uploads/2016/10/1999-Ford-Super-Duty.pdf** (last visited Oct. 10, 2022) [hereinafter 1999 Super Duty Brochure].

21

65.     The brochure for the 2001 Super Duty Series followed suit, highlighting the "highest, best-in-class GVWR rating" of the Vehicles[17]:



---

[17] F-250/F-350 Brochure (2001), **https://www.xr793.com/wp-content/uploads/2019/03/2001-Ford-F150-Super-Duty.pdf** (last visited Oct. 10, 2022) [hereinafter 2001 Super Duty Brochure].

14

66.    Towing capacity is similarly influenced by a lower vehicle curb weight: towing capacity is calculated by subtracting the curb weight of a vehicle from its gross combined total weight.[18] Ford's advertisements for the Super Duty Vehicles also emphasized the high towing capacity of the Vehicles— for example, this brochure from 2002 highlights that the F-250 has the "highest conventional trailer towing of any pickup. All 12,500 lbs. of it!"[19]




67.    Similar advertisements were made for other model years of the Affected Vehicles.[20] An advertisement for the 2006 Super Duty Vehicles boasted that the Vehicles had the "highest payload and

---

[18] *Truck Payload Vs. Towing Capacity: What You Need to Know*, *supra* note 15.

[19] Super Duty Contents, at 5, **https://www.motorologist.com/wp-content/uploads/2002-Ford-F250-F350-brochure.pdf** (last visited Oct. 10, 2022) [hereinafter 2002 Super Duty Brochure].

[20] *See, e.g.*, Commercial Vehicles (2002), at 17, **https://www.xr793.com/wp-content/uploads/2016/10/2002-Ford-Commercial.pdf** (last visited Oct. 10, 2022) [hereinafter 2002

15

towing capacities of any full-size pickup,”[21] and the brochure for the 2007 Super Duty Vehicles claimed that the “F-Series Super Duty can take on payload, passengers, fuel and cargo up to 13,000 lbs” due to the truck’s high GVWR.[22]

68. The payload and towing capacity of the Affected Vehicles could not have been achieved without the Roof Defect, which, as explained below, reduced the curb weight of the Super Duty Vehicles.

---

F-Series Brochure]; F-250/F-350 Super Duty (2003), **https://www.auto-brochures.com/makes/Ford/Super Duty/Ford_US%20Super Duty_2003.pdf** (last visited Oct. 10, 2022) [hereinafter 2003 Super Duty Brochure]; Ford RV & Trailer Towing Guide (2004), at 4, **https://www.rvsafety.com/images/pdf/FordTG2004.pdf** (last visited Oct. 10, 2022) [hereinafter 2004 Towing Guide]; 2005 RV & Trailer Towing Guide, at 4, **https://www.rvsafety.com/images/pdf/FordTG2005.pdf** (last visited Oct. 10, 2022) [hereinafter 2005 Towing Guide];

[21] F-250/F-350 Super Duty Brochure, at 1 (2006), **https://www.auto-brochures.com/makes/Ford/Super Duty/Ford_US%20Super Duty_2006.pdf** (last visited Oct. 10, 2022) [hereinafter 2006 Super Duty Brochure].

[22] F-250/F-350 Super Duty Brochure, at 2 (2007), **http://www.louiscandell.com/pdf/fire/2007_ford_super_duty_catalog.pdf** (last visited Oct. 10, 2022) [hereinafter 2007 Super Duty Brochure]; *see also* The New F-Series Super Duty F-250/F-350/F-450 Pickups (2008), **https://www.xr793.com/wp-content/uploads/2016/10/2008-Ford-Super-Duty.pdf** (last visited Oct. 10, 2022) [hereinafter 2008 Super Duty Brochure]; 2009 Super Duty Brochure, *supra* note 13; F-Series Super Duty Pickup (2010), **https://www.thedieselstop.com/attachments/Super Duty-brochure-pdf.43185/** (last visited Oct. 10, 2022) [hereinafter 2010 Super Duty Brochure]; 2011 Super Duty, **https://www.auto-brochures.com/makes/Ford/Super Duty/Ford_US%20Super Duty_2011.pdf** (last visited Oct. 10, 2022) [hereinafter 2011 Super Duty Brochure]; 2012 Super Duty, **https://cdn.dealereprocess.org/cdn/brochures/ford/2012-f350Super Duty.pdf** (last visited Oct. 10, 2022) [hereinafter 2012 Super Duty Brochure]; 2013 Super Duty, **https://cdn.dealereprocess.org/cdn/brochures/ford/2013-f350Super Duty.pdf** (last visited Oct. 10, 2022) [hereinafter 2013 Super Duty Brochure]; ’14 Super Duty, **http://grufmanbil.se/m/media/mektips/fbro-2014Super Duty.pdf** (last visited Oct. 10, 2022) [hereinafter 2014 Super Duty Brochure]; 2015 Super Duty, **https://cdn.dealereprocess.org/cdn/brochures/ford/2015-Super Duty.pdf** (last visited Oct. 10, 2022) [hereinafter 2015 Super Duty Brochure]; 2016 Super Duty, **https://cdn.dealereprocess.org/cdn/brochures/ford/2016-f350Super Duty.pdf** (last visited Oct. 10, 2022) [hereinafter 2016 Super Duty Brochure].

### 2.    Ford Marketed Safety Features that the Roof Defect Rendered Ineffective

69.     Ford also marketed the Super Duty Vehicles' safety features that would protect drivers in the event of a rollover accident—including features that are rendered worthless by the Affected Vehicles' Roof Defect.[23] For example, a marketing brochure for the 2016 Super Duty notes the "Safety Canopy System with side-curtain airbags for all rows and rollover sensor."[24] Ford's Safety Canopy System "deploys during significant side crashes or when a certain likelihood of a rollover event is detected by the rollover sensor" and is designed to "enhance protection provided in … rollover events."[25]

70.     Another brochure for the 2013 Super Duty Vehicles highlights the Safety Canopy system, telling drivers to "[t]ake comfort in serious safety standards like the driver and right-front-passenger front airbags, front-seat side airbags, and our Safety Canopy System with its rollover sensor and side-curtain airbags."[26]

---

[23] *See, e.g.*, Insurance Institute for Highway Safety & Highway Loss Data Institute, *About Our Tests: Roof Strength Test*, IIHS HLDI, **https://www.iihs.org/ratings/about-our-tests#roof-strength-test** (last visited Sept. 21, 2022).
[24] 2016 Super Duty Chassis Cab Brochure, **https://pictures.dealer.com/g1aforddirect/32dc01720a0e0acc3c03c177f368c1b6.pdf** (last visited Oct. 9, 2022).
[25] *Supplementary Restraints System – Safety Canopy*, Ford Service Content (2016), **https://www.fordservicecontent.com/Ford_Content/vdirsnet/OwnerManual/Home/Content?variantid=3705&languageCode=en&countryCode=USA&Uid=G1599805&ProcUid=G1518532&userMarket=usa&div=f&vFilteringEnabled=False** (last visited Oct. 10, 2022).
[26] 2013 Super Duty Brochure, *supra* note 22, at 16.

17

**LOTS OF WAYS TO MAKE IT YOURS.**







Take comfort in serious safety standards like the driver and right-front-passenger front airbags, front-seat side airbags, and our Safety Canopy® System with its rollover sensor and side-curtain airbags. Add options to help power your electronics, extend your cargo-carrying capabilities, stow your valuables securely out of sight and much more. Build the Super Duty® you want, just the way you want it.

6 airbags standard

Mini-console with front bucket seats¹

Flow-through center console¹ with 110-volt power outlet and two 12-volt powerpoints

Stowable bed extender¹

LARIAT Crew Cab with lockable rear under-seat storage¹ and flow-through center console¹




¹Available feature.

2013 SUPER DUTY® ford.com

71.     Ford advertised the Safety Canopy System as a feature in at least the 2011, 2012, 2013, 2014, 2015, and 2016 Vehicles.²⁷

72.     When vehicles are in rollover accidents, it is true that side curtain airbags—such as those in the Safety Canopy System—and seatbelt use help protect vehicle occupants; however, "for [those]

²⁷ 2011 Super Duty Brochure, *supra* note 22, at 4; 2012 Super Duty Brochure, *supra* note 22, at 16; 2013 Super Duty Brochure, *supra* note 22, at 16; 2014 Super Duty Brochure, *supra* note 22, at 14; 2015 Super Duty Brochure, *supra* note 22, at 14; 2016 Super Duty Chassis Cab Brochure, *supra* note 24, at 14.

safety technologies to be most effective, the roof must be able to maintain the occupant survival space when it hits the ground during a rollover."[28] The Roof Defect prevents any of the purported protections offered by the Safety Canopy System from helping vehicle occupants.

73.     Ford also advertised the Super Duty Vehicles as being appropriate for off-road driving (commonly referred to as "off-roading"), like in this 2003 advertisement that told drivers, "[i]f the terrain you usually operate on is outside of town, then the new F-250/F-350 FX4 Off-Road Super Duty is what you need to think about."[29]



---

[28] Insurance Institute for Highway Safety & Highway Loss Data Institute, *supra* note 23.
[29] F-250/F-350 Super Duty (2003), **https://www.auto-brochures.com/makes/Ford/Super Duty/Ford_US%20Super Duty_2003.pdf** (last visited Oct. 10, 2022).

74.     One of the most common risks for off-road driving is the risk of a rollover.[30]

**B.      The Roof Defect**

75.     Multiple juries and courts have concluded that the roof design in 1999–2016 Ford Super Duty Vehicles is defective; the roofs are not strong enough to withstand the weight of the vehicle in the event of a rollover accident.

### 1.      Roof Cab Safety is a Critical Component of Vehicle Safety

76.     Thousands of people are killed every year in rollover accidents.[31] While "[t]he best way to prevent these deaths is to keep vehicles from rolling over in the first place . . . . [w]hen vehicles do roll, . . . the roof [of a vehicle] must be able to maintain the occupant survival space when it hits the ground during a rollover."[32] Stronger roofs both "crush less, reducing the risk that people will be injured by contact with the roof itself," and also "can prevent occupants, especially those who aren't using safety belts, from being ejected through windows, windshields or doors that have broken or opened because the roof has deformed."[33]

77.     The automotive industry has recognized the importance of vehicle roof strength since at least the 1960s. In 1965, Defendant Ford, along with General Motors, highlighted the importance of roof safety in rollover accidents in testimony before Congress, and by 1966, Ford had designed a "roof drop test" to test roof crush.[34]

78.     In 1971, the National Highway Traffic Safety Administration ("NHTSA") issued its first rule establishing a roof crush standard for passenger vehicles—which, at the time, outnumbered light

---

[30] Surya, *How Dangerous is Off-Roading? Precautions and Avoidables*, Off-Road Handbook, **https://offroadhandbook.com/how-dangerous-is-off-roading/** (last visited Oct. 10, 2022).
[31] Insurance Institute for Highway Safety & Highway Loss Data Institute, *supra* note 23.
[32] *Id.*
[33] *Id.*
[34] *Chronology of 1971 Roof Strength Standard*, Public Citizen (Sept. 2008), **https://www.citizen.org/wp-content/uploads/migration/chronology_ of_roof_crush_standard.pdf** (last visited Sept. 23, 2022).

trucks almost five to one—which took effect in 1973.[35] This rule was the result of an automaker-led "industrywide effort to convince federal officials to adopt a minimum standard for roof strength," but "after … vehicle fleets failed the government's first proposed test," the automotive industry successfully lobbied for a weaker test that would "allow [their] vehicles to pass."[36]

79.     This NHTSA rule required roofs on passenger vehicles to withstand 1.5 times the weight of the unloaded vehicle, measuring roof strength from only one side of the vehicle.[37]

80.     In 1989, in an effort to address to explosive growth of SUVs and pick-up trucks, NHTSA attempted to "apply the regulation to vehicles weighing up to 10,000 pounds," but the Big Three car companies—General Motors, Chrysler, and Defendant Ford—"lobbied against it and NHTSA gave in, agreeing to only a 6,000 pound limit."[38] "In effect, the heaviest trucks and SUVs[, including the Ford Super Duty trucks,] … are technically exempt from the … test."[39]

81.     In 2003, NHTSA published a report titled *Characteristics of Fatal Rollover Crashes*, reporting that pickup trucks have a rollover fatality rate at 7.52 per 100,000 registered vehicles—over double the fatality rate for cars.[40] A year later, NHTSA listed a proposed rule to upgrade roof crush resistance, which was not finalized until 2009.[41] This update extended the applicability of the roof crush resistance standard to vehicles over 6,000 pounds—though still declined to apply the standard to

---

[35] *Id.*

[36] Bill Vlasic & Jeff Plungis, *Danger Overhead: Crushed Roofs: Thousands killed, hurt as auto roofs collapse*, The Detroit News (Apr. 11, 2004), **https://www.fordforums.com/threads/u-s-danger-overhead-crushed-roofs-thousands-killed-hurt-as-auto-roofs-collapse.64660/** (last visited Sept. 26, 2022).

[37] *Id.*

[38] *Id.*

[39] *Id.*

[40] *Chronology of 1971 Roof Strength Standard*, *supra* note 34.

[41] *Id.*; *see also* Federal Motor Vehicle Safety Standards; Roof Crush Resistance (Apr. 7, 2010), available at **https://www.federalregister.gov/documents/2010/04/07/2010-7907/federal-motor-vehicle-safety-standards-roof-crush-resistance** (last visited Oct. 10, 2022).

vehicles over 10,000 pounds—but did not require automakers to reach 100% compliance until September 2015.[42]

### 2. The Roof Defect Severely Impacts the Safety of the Affected Vehicles

82. The Affected Vehicles are constructed around a steel frame, which is intended to maintain the form and structure of the vehicle, and keep the occupants of the vehicle safely within the passenger cab, in the event of an accident. This steel frame is not strong enough to support the weight of the Affected Vehicles, resulting in the collapse of the passenger cab in the event that the vehicle rolls over.

83. The Roof Defect has caused serious injury, paralysis, and death to vehicle drivers and occupants. Ford has repeatedly been found liable for injuries and deaths resulting from the Roof Defect in the over 160 wrongful death and personal injury lawsuits that have been filed against it regarding the Defect.[43] Further, Ford itself has identified over 80 incidents of roof crush resulting from the Defect.[44]

84. As previously discussed, many of the safety features advertised by Ford are also impacted by the Roof Defect.[45] Ford's much-touted Safety Canopy System—which is advertised as a way to increase safety in the event of a rollover accident—is virtually useless in the event of a rollover of an Affected Vehicle due to the Roof Defect.[46]

### C. Ford Knew of the Roof Defect when it Sold the Affected Vehicles

85. Ford has known of both the importance of roof strength in the event of a rollover accident and of the inadequacy of the roof strength of the Affected Vehicles since 1999, when the Super Duty

---

[42] *See, e.g.*, Fern Gatilao, Gerald Roesser, & Brad Reaume, *An Overview of FMVSS 216a – Roof Crush Resistance Testing*, SAE International (2010), available at **https://www.sae.org/publications/technical-papers/content/2010-01-1020/** (last visited Oct. 10, 2022).
[43] *See* Nora Eckert, *Roof Strength on Older Ford Trucks Called Into Question by $1.7 Billion Jury Verdict*, Wall St. J. (Aug. 22, 2022), **https://www.wsj.com/articles/ford-faces-1-7-billion-verdict-in-fatal-rollover-of-f-250-pickup-11661033662** (last visited Oct. 10, 2022).
[44] *Id.*
[45] *See supra* Section IV.A.2.
[46] *See id.*

22

line of vehicles was introduced. As detailed above, Ford was intimately involved in the NHTSA rulemaking process that resulted in roof crush resistance rules not being applied to the Super Duty Vehicles.[47]

86.     But Ford went further than advocating for the inapplicability of roof strength standards to its Super Duty Vehicles: "[i]n 1999, Ford *twice reduced* the thickness of the steel in the A-pillars of its heavy-duty F-series pickups."[48] In the *Ott v. Ford Motor Co.* lawsuit, plaintiff found evidence that these reductions were in order to lower production costs and increase profitability of the Super Duty line.[49]

87.     Ford knew of the dangers of roof collapse as early as 1968, when it issued an intra-company safety evaluation called "the Weaver memo." In this memorandum, Ford noted that "[r]oof intrusion may have a more pronounced effect on occupant injuries with increased usage of upper torso restraints. People are injured by roof collapse. The total number of nationwide deaths and injuries cannot be estimated but it is a significant number."[50] Despite this memorandum, Ford submitted comments to NHTSA in their advocacy for the inapplicability of the roof strength standards to larger vehicles that "questioned whether crushed roofs even posed a danger—a direct contradiction of its own 1968 study. 'The data do not implicate top intrusion as an automotive safety problem,' Ford said in its April 5, 1971 comments to the agency."[51]

88.     Throughout the 1970's and '80's, the importance of roof crush resistance became well known in the automotive industry—in 1973, as part of the introduction of Federal Safety Standard 216, NHTSA stated that "[i]t has been determined … that improved roof strength will increase occupant protection in rollover accidents."[52] Almost ten years later, NHTSA issued another report on roof strength

---

[47] *See supra* Section IV.B.1.
[48] Vlasic & Plungis, *supra* note 36 (emphasis added).
[49] *Ott v. Ford Motor Co.*, No. 4:03-cv-00101, Dkt. No. 76-2, at 3.
[50] Byron Bloch, *Protecting Occupants in Rollover Crashes: Case Examples and Latest Technologies*, at 1 (2011), **https://www-esv.nhtsa.dot.gov/Proceedings/22/files/22ESV-000344.pdf** (last visited Oct. 11, 2022).
[51] Vlasic & Plungis, *supra* note 36.
[52] *Id.* at 2.

23

that stated in part that "accident statistics show that the degree of roof intrusion is highly associated with occupant injury severity and rate."[53] Ford, as a member of the Automobile Manufacturers Association, was aware of these reports.[54]

89.     Following the automotive industry's success in lobbying NHTSA not to impose a roof strength regulation on larger vehicles—such as the Affected Vehicles—Ford used the lack of regulation as justification to decline to test roof strength in its larger vehicles. James K. Wagner, Automotive Safety and Engineering Standards FAO at Ford, stated in 1995 that physical roof crush testing was not performed on larger vehicles: "The LAW applies only to vehicles of 6,000 lbs. GVW and under ... the PHN131 Safety Panel Chart ... merely stated that the vehicles would meet all Safety Design Guidelines. ... There are no roof crush requirements in the Heavy Truck Safety Design Guidelines."[55]

90.     By 1994, Ford had the technology to institute stronger roofs in their heavy-duty vehicles, but chose not to utilize it. An October 1994 internal memorandum indicated that placing an X-shaped roof bow in in the rear increased roof crush resistance by 1,700 pounds, with a weight penalty of only 1.5 pounds.[56] Another internal memorandum from January 1995 reported that placing two roof bows in the roof would increase crush resistance to 10,000 pounds.[57] Despite this evidence that roofs could be strengthened by roof bows, they were never incorporated into Ford's heavy duty vehicles.[58]

91.     By the mid-1990's, when Ford twice decreased the roof crush resistance of the heavy duty vehicles before rebranding them as the Super Duty Vehicles, Ford was aware of the dangers of

---

[53] *Id.*

[54] *Industry Concealment of Tests Undermined Development of Meaningful Rollover Crash Roof Crush Resistance Standard in 1971*, Public Citizen, **https://www.citizen.org/wp-content/uploads/industry_undermines_roof_strength_standard_of_1971.pdf** (last visited Oct. 11, 2022).

[55] *Gibson v. Ford Motor Co.*, No. 1:06-cv-01237, Dkt. No. 177-1, at 3.

[56] *Id.* at 15–25.

[57] *Id.*

[58] *Id.*

24

insufficient roof crush resistance. Ford claims to put its vehicles, including the Affected Vehicles, through rigorous durability testing that would have exposed the Roof Defect to its engineers.[59]

92.    Finally, in 2004, Ford engineers "developed a stronger roof for its Super Duty pickups," but didn't use that roof in trucks sold to customers until the 2017 model year.[60] For over ten years, Ford knew that it had developed a stronger roof model for the Super Duty Vehicles, yet continued to let preventable injuries and deaths occur due to the defective, dangerous roofs in the Super Duty Vehicles.

**D.    The Affected Vehicles are No Longer Covered by Ford's Vehicle Warranties**

93.    Ford's New Vehicle Limited Warranty for Super Duty model years 1999–2016 provides "bumper-to-bumper" coverage for 3 years/36,000 miles, whichever comes first.[61]

94.    Because the Affected Vehicles are all model year 2016 and older, no Affected Vehicles are still covered under Ford's new vehicle and powertrain warranties.

## V.    CLASS ACTION ALLEGATIONS

**A.    Class Definitions.**

95.    Pursuant to Rules 23(a), (b)(2), and (b)(3) of the Federal Rules of Civil Procedure, Plaintiff brings this action on behalf of himself, the Nationwide Class, defined as:

> **Nationwide Class:** All persons or entities in the United States (including its territories and the District of Columbia) who purchased or leased a 1999–2016 Super Duty Vehicle ("Class Vehicle").

---

[59] Byron Pope, *Ford Takes Human Element Out of Vehicle-Durability Test Drives*, WardsAuto (June 16, 2013), **https://www.wardsauto.com/industry/ford-takes-human-element-out-vehicle-durability-test-drives** (last visited Oct. 11, 2022).

[60] Eckert, *supra* note 43.

[61] *See, e.g.*, 1999 Super Duty Brochure, *supra* note 16; 2001 Super Duty Brochure, *supra* note 17; 2002 Super Duty Brochure, *supra* note 19; 2003 Super Duty Brochure, *supra* note 20; 2006 Super Duty Brochure, *supra* note 21; 2007 Super Duty Brochure, *supra* note 22; 2008 Super Duty Brochure, *supra* note 22; 2009 Super Duty Brochure, *supra* note 22; 2010 Super Duty Brochure, *supra* note 22; 2011 Super Duty Brochure, *supra* note 22; 2012 Super Duty Brochure, *supra* note 22; 2013 Super Duty Brochure, *supra* note 22; 2014 Super Duty Brochure, *supra* note 22; 2015 Super Duty Brochure, *supra* note 22; 2016 Super Duty Brochure, *supra* note 22.

25

96.     In addition to the Nationwide class, and pursuant to Fed. R. Civ. P. 23(c)(5), Plaintiff seeks to represent the following State Class as well as any subclasses or issue classes as Plaintiff may propose and/or the Court may designate at the time of class certification:

**California State Class:** All persons or entities in the state of California who purchased or leased a 1999–2016 Super Duty Vehicle ("Class Vehicle").

**Kentucky State Class:** All persons or entities in the state of Kentucky who purchased or leased a 1999–2016 Super Duty Vehicle ("Class Vehicle").

**North Carolina Class:** All persons or entities in the state of North Carolina who purchased or leased a 1999–2016 Super Duty Vehicle ("Class Vehicle").

**Oklahoma Class:** All persons or entities in the state of Oklahoma who purchased or leased a 1999–2016 Super Duty Vehicle ("Class Vehicle").

**Oregon Class:** All persons or entities in the state of Oregon who purchased or leased a 1999–2016 Super Duty Vehicle ("Class Vehicle").

**Washington State Class:** All persons or entities in the state of Washington who purchased or leased a 1999–2016 Super Duty Vehicle ("Class Vehicle").

97.     Excluded from the Classes are individuals who have personal injury claims resulting from the conduct and defects alleged herein; Defendant and its subsidiaries, affiliates, and officers; all persons who timely elect to exclude themselves from the Classes; and the Judge to whom this case is assigned and his or her immediate family. Plaintiff reserves the right to revise the Class definitions based on information learned through discovery.

98.     Certification of Plaintiff's claims for class-wide treatment is appropriate because Plaintiffs can prove the elements of their claims regarding liability and entitlement to damages on a class-wide basis using the same evidence as would be used to prove those elements in individual actions alleging the same claim. This action has been brought and may be properly maintained on behalf of the Nationwide Class and/or State Class proposed herein under Fed. R. Civ. P. 23.

99.     Plaintiffs reserve the right to modify the definition of the Nationwide and/or any State Subclass prior to class certification.

26

**B.    Class Certification Requirements.**

100.    **Numerosity: Rule 23(a)(1):** The members of the Class are so numerous and geographically dispersed that individual joinder of all Class members is impracticable. Plaintiffs are informed and believe, based on available information on the volume of sales of Class Vehicles, that there are tens of thousands of members in the Class (if not hundreds of thousands). The precise number of Class Members may be ascertained from Defendant's records and vehicle registration records. Class Members may be notified of the pendency of this action by recognized, Court-approved notice dissemination methods, which may include U.S. mail, electronic mail, Internet postings, social media, and published notice.

101.    **Commonality and Predominance: Rules 23(a)(2) and 23(b)(3):** This action involves significant common questions of law and fact, which predominate over any questions affecting individual Class members, including, but not limited to:

A.    Whether Defendant engaged in the conduct alleged herein;

B.    Whether Defendant designed, advertised, marketed, distributed, leased, sold, or otherwise placed Class Vehicles into the stream of commerce in the United States;

C.    Whether the Class Vehicles have the defect alleged herein, and whether the defect constitutes a safety-related defect;

D.    Whether Defendant knew that the Class Vehicles contained the defect as alleged herein;

E.    Whether a reasonable consumer would consider the defect alleged herein and its consequences material to the decision to purchase or lease a Class Vehicle;

F.    When Defendant discovered or knew of the existence of the defects alleged herein;

G.    Whether Plaintiffs and the other Class Members overpaid for their Class Vehicles as a result of the defects and Defendant's concealment thereof;

27

H.     Whether Defendant had a duty to disclose the true nature of the Class Vehicles to Plaintiffs and Class Members;

I.     Whether Plaintiffs and Class Members suffered out-of-pocket losses as a result of the defect alleged herein and whether Plaintiff and Class members will suffer out-of-pocket losses as a result of the proposed recalls;

J.     Whether Defendant omitted, concealed, and/or failed to disclose material facts about the Class Vehicles;

K.     Whether Defendant's concealment of the true nature of the Class Vehicles would have induced a reasonable consumer to act to his or her detriment by purchasing and/or leasing the Class Vehicles;

L.     Whether Plaintiffs and Class Members are entitled to equitable relief, including, but not limited to, restitution or injunctive relief; and

M.     Whether Plaintiffs and Class Members are entitled to damages and other monetary relief and, if so, in what amount.

102.     **Typicality: Rule 23(a)(3):** Plaintiffs' claims are typical of the claims of the Class Members whom they seek to represent under Fed. R. Civ. P. 23(a)(3), because Plaintiffs and each Class Member purchased a Class Vehicle and were similarly injured through Defendant's wrongful conduct as described above. Plaintiffs and Class Members suffered damages as a direct, proximate result of the same wrongful practices by Defendant. Plaintiffs' claims arise from the same practices and courses of conduct that give rise to the claims of the other Class Members. Plaintiffs' claims are based upon the same legal theories as the claims of the other Class Members.

103.     **Adequacy: Rule 23(a)(4):** Plaintiffs will fairly and adequately represent and protect the interests of the Class members as required by Fed. R. Civ. P. 23(a)(4). Plaintiffs have retained counsel competent and experienced in complex class action litigation, including vehicle defect litigation and other consumer protection litigation. Plaintiffs intend to prosecute this action vigorously. Neither

28

Plaintiffs nor their counsel have interests that conflict with the interests of the other Class Members. Therefore, the interests of the Class Members will be fairly and adequately protected.

104.    **Declaratory and Injunctive Relief: Rule 23(b)(2):** Defendant has acted or refused to act on grounds generally applicable to Plaintiffs and the other members of the Class, thereby making appropriate final injunctive relief and declaratory relief, as described below, with respect to the Class as a whole.

105.    **Superiority: Rule 23(b)(3):** A class action is superior to any other available means for the fair and efficient adjudication of this controversy, and no unusual difficulties are likely to be encountered in the management of this class action. The damages or other financial detriment suffered by Plaintiffs and the other Class Members are relatively small compared to the burden and expense that would be required to individually litigate their claims against Defendant, so it would be impracticable for members of the Class to individually seek redress for Defendant's wrongful conduct. Even if Class Members could afford individual litigation, the court system could not. Individualized litigation creates a potential for inconsistent or contradictory judgments and increases the delay and expense to all parties and the court system. By contrast, the class action device presents far fewer management difficulties and provides the benefits of single adjudication, economies of scale, and comprehensive supervision by a single court.

## VI.    EQUITABLE TOLLING

### A.    Discovery Rule Justifies Tolling.

106.    Plaintiffs and Class Members did not discover, and could not have discovered through the exercise of reasonable diligence, Defendant's deception concerning the safety-related defect alleged herein.

107.    Defendant's concealment is ongoing, as evidenced by the fact that they have not issued any recall of the Class Vehicles.

108.    Plaintiffs and Class Members could not have discovered through the exercise of reasonable diligence that Defendant were concealing the defect.

109.    Unless a Class member experienced a catastrophic rollover accident, Plaintiffs and Class Members would have no reason to discover the defect alleged herein, and even if they did experience such an accident, as Plaintiff Rains's son did, would have no reason to discover the existence of a widespread defect and effort to conceal it.

110.    Plaintiffs and Class Members therefore did not discover, and did not know of, facts that would have caused a reasonable person to suspect that Defendant had concealed information about defects in the Class Vehicles until shortly before this action was filed.

111.    For these reasons, all applicable statutes of limitation have been tolled by operation of the discovery rule with respect to claims as to the Class Vehicles.

**B.      Fraudulent Concealment Justifies Tolling.**

112.    All applicable statutes of limitation have also been tolled by Defendant's knowing, active and ongoing fraudulent concealment of the facts alleged herein.

113.    Defendant concealed the defects and failed to disclose or remedy them for years because Defendant still haven't admitted the defect, but Defendant knew about the defect before the earliest Class Vehicles were sold, based on presale testing and extensive research regarding roof crush resistance. Defendant's concealment continues to date.

**C.      Estoppel Justifies Tolling.**

114.    Defendant was and is under a continuous duty to disclose to Plaintiffs and Class Members the true character, quality, and nature of the Class Vehicles, including the vehicles' safety-related defect as alleged herein, and the inevitable repairs, costs, time, and monetary damage resulting therefrom. Defendant actively concealed the true character, quality, and nature of the Class Vehicles and have not disclosed the full nature of the safety-related defect.

30

115. Based on the foregoing, Defendant is estopped from relying on any statutes of limitations in defense of this action.

## VII.    CLAIMS FOR RELIEF

### A.    Claims Brought on Behalf of the Nationwide Class

### COUNT ONE — COMMON LAW FRAUD – AFFIRMATIVE MISREPRESENTATION
#### (as to the 2011–16 Class Vehicles)

116. Plaintiffs reallege and incorporate by reference all paragraphs as though fully set forth herein.

117. Plaintiffs assert this claim affirmative misrepresentation theory of fraud on behalf of themselves and the Nationwide Class or, in the alternative, on behalf of the State Subclasses, against Defendant Ford with respect to the 2011–16 Class Vehicles.

118. In its advertisements, Ford explicitly represented that the 2011–16 Class Vehicles were equipped with the Safety Canopy System to provide increased protection in the event of a rollover of the vehicle. Ford communicated through these advertisements that the Class Vehicles were safe in the event of a rollover accident.

119. Ford further affirmatively misrepresented to Plaintiffs in advertising and other forms of communications, including standard and uniform material provided with each vehicle, that the Class Vehicles it was selling had no significant defects and would perform and operate properly, including with respect to the Safety Canopy System. Ford knew that these representations were false when made.

120. In fact, the 2011–16 Class Vehicles purchased or leased by Plaintiffs and Class Members were, in fact, defective, unsafe, and unreliable, because the Roof Defect rendered the Safety Canopy System ineffective in the event of a rollover accident.

121. Ford has known since before the introduction of the Safety Canopy System in the 2011 Class Vehicles that the Roof Defect existed, and that the Safety Canopy System would be rendered ineffective in the event of a rollover accident because the roof would collapse. Even so, Ford made

specific representations about the safety of the Class Vehicles in the event of a rollover accident when it advertised its Safety Canopy System. Ford broadcast those advertisements with the intent that members of the general public would rely on these representations in making their purchases.

122.    A reasonable consumer would have done just that, expecting that the Class Vehicles would not be defective or pose a serious safety risk, and that Ford's representations about the Safety Canopy System would be accurate.

123.    Plaintiffs and Class Members relied on Ford's affirmative misrepresentations regarding the safety of the Class Vehicles, including its misrepresentations specifically regarding the Safety Canopy System, when deciding to purchase or lease the Class Vehicles. Had they known the true nature of the Class Vehicles, they would not have purchased or leased the Class Vehicles or would have paid less for them. Plaintiffs and Class Members were therefore fraudulently induced to purchase or lease the Class Vehicles with the defects alleged herein, and the resulting harms.

124.    To the extent that Ford's conduct was willful, oppressive, or malicious, Plaintiffs and Class Members are entitled to an award of punitive damages.

**COUNT TWO — COMMON LAW FRAUD – FRAUDULENT CONCEALMENT/FRAUD BY OMISSION**

125.    Plaintiffs reallege and incorporate by reference all paragraphs as though fully set forth herein.

126.    Plaintiffs assert this claim on behalf of themselves and the Nationwide Class, or, in the alternative, on behalf of the State Subclasses, against Defendant Ford.

127.    The Class Vehicles that Plaintiffs and Class Members purchased or leased were defective and unsafe because the roof of the vehicles are subject to collapse in the event of a rollover accident, crushing the drivers and occupants of the passenger cab and causing serious injury or death.

128.    Ford intentionally concealed the Roof Defect and acted with reckless disregard for the truth when it failed to disclose to consumers for years that the Vehicle roofs were not strong enough to

withstand the weight of the Vehicles, and would collapse in the event of a rollover accident. Further, Ford advertised these Vehicles as appropriate for off-road driving, which has an increased risk of rollover events.

129.   Ford had a duty to disclose this material safety information to Plaintiffs and Class Members because it knew about the safety hazards posed by the Roof Defect, and instead concealed the defect from the general public.

130.   Plaintiffs and Class Members did not know about the Roof Defect and could not have discovered it through reasonably diligent investigation before Ford disclosed it—or until they experienced a rollover accident and the roof of their Vehicles collapsed, causing serious injury, paralysis, or even death.

131.   But for Ford's fraudulent omissions of material information, Plaintiffs and Class Members would not have purchased or leased the Class Vehicles, or would have paid less for them. Plaintiffs and Class Members have sustained damage because they purchased or leased Vehicles that were not as represented, and because they now own or lease Class Vehicles that are unsafe and never should have been placed in the stream of commerce. Accordingly, Ford is liable to Plaintiffs and Class Members for damages in an amount to be proven at trial for the lost benefit of the bargain and overpayment at the time of purchase or lease, and/or for the diminished value of the Class Vehicles.

132.   Ford's acts were done wantonly, deliberately, with intent to defraud, in reckless disregard of the rights of Plaintiffs and Class Members, and to enrich themselves. Ford's misconduct warrants an assessment of punitive damages in an amount sufficient to deter such conduct in the future, which amount shall be determined according to proof at trial.

<div align="center">

**COUNT THREE — VIOLATIONS OF
THE MAGNUSON–MOSS WARRANTY ACT
(15 U.S.C. § 2301, *et seq.*)**

</div>

133.   Plaintiffs reallege and incorporate by reference all paragraphs as though fully set forth herein.

134.    Plaintiffs assert this claim on behalf of themselves and the Nationwide Class or, in the alternative, on behalf of the State Subclasses, against Defendant Ford.

135.    Plaintiffs and the Class members are "consumers" within the meaning of the Magnuson-Moss Warranty Act, 15 U.S.C. § 2301(3).

136.    Ford is a supplier and warrantor within the meaning of 15 U.S.C. §§ 2301(4)-(5).

137.    The Class Vehicles, including Plaintiffs' Vehicles, are "consumer products" within the meaning of 15 U.S.C. § 2301(1).

138.    15 U.S.C. § 2301(d)(1) provides a cause of action for consumers who are damaged by the failure of a warrantor to comply with an implied warranty.

139.    Ford provided Plaintiffs and Class Members with an implied warranty of merchantability in connection with the purchase or lease of the Class Vehicles that is an "implied warranty" within the meaning of 15 U.S.C. § 2301(7). As part of the implied warranty of merchantability, Ford warranted that the Class Vehicles were fit for their ordinary purpose and would pass without objection in trade as designed, manufactured, and marketed, and were adequately contained, packaged, and labeled.

140.    Ford breached its implied warranties as described herein by selling Vehicles with the Roof Defect, and is therefore liable to Plaintiffs and Class Members under 15 U.S.C. § 23102(d)(1). Without limitation, the Class Vehicles share a common defect in that they are all equipped with the Roof Defect that makes the Vehicles unsafe in the event of a rollover accident, causing an unreasonable risk of serious injury or death to owners and lessees of the Class Vehicles. The Roof Defect renders the Class Vehicles unmerchantable and unfit for their ordinary use of driving, both at the time of purchase or lease and at all times thereafter.

141.    The amount in controversy of Plaintiffs' individual claims meets or exceeds the sum or value of $25.00. In addition, the amount in controversy meets or exceeds the sum or value of $50,000 (exclusive of interests and costs) computed on the basis of all claims to be determined in this suit.

142.    Ford has been given reasonable opportunity to cure its breach of the implied warranty of merchantability. Ford chose to omit information about the Roof Defect from Plaintiffs and Class Members, misrepresented the qualities of the Class Vehicles, and has failed to acknowledge or provide a fix for the Roof Defect.

143.    As a direct and proximate cause of Ford's breach of the implied warranty of merchantability, Plaintiffs and the other Class members sustained damages and other losses in an amount to be determined at trial. Ford's conduct damaged Plaintiffs and the other Class members, who are entitled to recover actual damages, consequential damages, specific performance, diminution in value, costs, including statutory attorney fees and/or other relief as deemed appropriate.

144.    Plaintiffs have had sufficient dealings with either Ford or its agents to establish privity of contract between Ford and Plaintiffs. Nonetheless, privity is not required here because Plaintiffs are intended third-party beneficiaries of contracts between Ford and its dealers, and, specifically, of Ford' implied warranties. The dealers were not intended to be the ultimate consumers of the Class Vehicles and have no rights under the warranty agreements provided with the Class Vehicles, which were designed for and intended to benefit consumers. Privity is also not required because the Roof Defect poses an unreasonable danger to owners and lessees of the Class Vehicles.

### COUNT FOUR — UNJUST ENRICHMENT

145.    Plaintiffs reallege and incorporate by reference all paragraphs as though fully set forth herein.

146.    Plaintiffs assert this claim on behalf of themselves and the Nationwide Class or, in the alternative, on behalf of the State Subclasses, against Defendant Ford.

147.    Plaintiffs and Class Members paid Ford the value of non-defective Class Vehicles with a roof that would not collapse in the event of a rollover accident. In exchange, Ford provided Plaintiffs and Class Members with defective Vehicles whose passenger cab is subject to collapse in the event of a rollover accident, crushing and seriously injuring or killing the Vehicle's occupants.

35

148.    As such, Plaintiffs and Class Members conferred value upon Ford which would be unjust for Ford to retain.

149.    As a direct and proximate result of Ford's unjust enrichment, Plaintiffs and Class Members have suffered and continue to suffer various injuries. As such, they are entitled to damages, including but not limited to all amounts by which Ford was enriched through its misconduct.

**B.    Claims Brought on Behalf of the California Subclass**

**COUNT FIVE — VIOLATIONS OF THE CALIFORNIA UNFAIR COMPETITION LAW CAL. BUS. & PROF. CODE § 17200, *ET SEQ.***

150.    Plaintiff Tellez realleges and incorporates by reference all paragraphs as though fully set forth herein.

151.    Plaintiff Tellez asserts this claim on behalf of himself and the California Subclass against Defendant Ford.

152.    California Business and Professions Code § 17200 prohibits any "unlawful, unfair, or fraudulent business act or practice."

153.    Ford has engaged in unlawful, fraudulent, and unfair business acts and practices in violation of the California Unfair competition Law by knowingly and intentionally concealing the serious Roof Defect in the Class Vehicles from Plaintiff and Class members, as well as the risks of serious harm and monetary damage stemming therefrom. This information was material to Plaintiff and Class members, just as it would have been to any reasonable consumer who purchased a vehicle that he or she believed was fit to drive and not at risk that the passenger cab would be crushed in the event of a rollover accident.

154.    Defendant was in a superior position to know the true nature of the Class Vehicles and Plaintiff and Class Members could not discover the true facts about the defects through ordinary and reasonable diligence. Defendant also had a duty to disclose the defect because it constitutes a safety issue for drivers and occupants of Class Vehicles.

155.    Even though Defendant knew of the Roof Defect before any of the Class Vehicles were sold, they continued to produce and market Class Vehicles for sale. Plaintiff and Class Members purchased or leased their Vehicles after Defendant had notice of the defects.

156.    Defendant's failure to disclose these facts violated the UCL, breached these duties to disclose, and injured Plaintiff and Class Members. Plaintiff and Class Members could not reasonably have avoided these injuries.

157.    These acts were likely to deceive the public, and did in fact deceive Plaintiff, about material information.

158.    Plaintiff requests that this Court enter such orders or judgments as may be necessary to enjoin Defendant from continuing their unfair, unlawful, and/or deceptive practices and to restore to Plaintiff and members of the Class any money Defendant acquired by unfair competition, including restitution and/or restitutionary disgorgement, as provided in California Business and Professions Code §§ 17203 and 3345; and for such other relief set forth below.

### COUNT SIX — VIOLATIONS OF THE CALIFORNIA FALSE ADVERTISING LAW CAL. BUS. & PROF. CODE § 17500, *ET SEQ.*

159.    Plaintiff Tellez realleges and incorporates by reference all paragraphs as though fully set forth herein.

160.    Plaintiff Tellez asserts this claim on behalf of himself and the California Subclass against Defendant Ford.

161.    California Business & Professions Code § 17500 provides that "[i]t is unlawful for any . . . . corporation . . . with intent directly or indirectly to dispose of real or personal property . . . to induce the public to enter into any obligation relating thereto, to make or disseminate or cause to be made or disseminated . . . from this state before the public in any state, in any newspaper or other publication, or any advertising device, . . . or in any other manner or means whatever, including over the Internet, any

statement . . . which is untrue or misleading, and which is known, or which by the exercise of reasonable care should be known, to be untrue or misleading[.]"

162. Defendant caused to be made and/or disseminated untrue or misleading statements throughout California and the United States, which were known or should have been known to Defendant to be untrue and misleading to consumers, including Plaintiff and Class Members, such as Defendant' claims about the safety of the Class Vehicles.

163. This conduct occurred in the course of Defendant's businesses and is part of a continuing pattern or generalized course of conduct in California and throughout the United States.

164. Defendant's conduct violated the California False Advertising law because their misleading omissions concerning the safety and functionality of Class Vehicles were material and likely to deceive a reasonable consumer.

165. Plaintiff and the other Class Members have suffered an injury in fact, including the loss of money or property, as a result of Defendant's unfair, unlawful, and/or deceptive practices. In purchasing or leasing Class Vehicles, Plaintiff and Class Members relied on Defendant's misrepresentations and/or omissions concerning the safety and reliability of the Class Vehicles. These representations were untrue because the Class Vehicles contained a serious safety-related defect that could result in the passenger cab being crushed under the weight of the Vehicle in the event of a rollover accident, causing serious injury or death to drivers and occupants. Had Defendant disclosed this, or had Plaintiff and Class Members known this, Plaintiff and Class Members would not have purchased or leased Class Vehicles at all or would have paid significantly less for them. Plaintiff and other Class Members overpaid at the time of purchase for vehicles that were not what they bargained for and did not receive and still have not received the benefit of their bargain because, due to their safety-related defect, their vehicles were not fit to drive.

166.    Even though Defendant knew of the engine defect before they sold any Class Vehicles, they continued to produce and market Class Vehicles for sale. Plaintiff and Class Members purchased or leased their Vehicles after Defendant had notice of the defect.

167.    Plaintiff requests that this Court enter such orders or judgments as may be necessary to enjoin Defendant from continuing their unfair, unlawful, and/or deceptive practices and to restore to Plaintiff and Class Members any money Defendant acquired by these practices, including restitution and/or restitutionary disgorgement, and for such other relief set forth below.

## COUNT SEVEN — VIOLATIONS OF THE CALIFORNIA CONSUMER LEGAL REMEDIES ACT CAL. CIV. CODE § 1750, *ET SEQ.*

168.    Plaintiff Tellez realleges and incorporates by reference all paragraphs as though fully set forth herein.

169.    Plaintiff Tellez asserts this claim on behalf of himself and the California Subclass against Defendant Ford.

170.    Defendant are "person[s]" under Cal. Civ. Code § 1761(c).

171.    Plaintiff and Class members are "consumer[s]," as defined by Cal. Civ. Code § 1761(d), who purchased or leased one or more Class Vehicles.

172.    The California Legal Remedies Act ("CLRA") prohibits "unfair or deceptive acts or practices undertaken by any person in a transaction intended to result or that results in the sale or lease of goods or services to any consumer[.]" Cal. Civ. Code § 1770(a). Defendant has engaged in unfair or deceptive acts or practices that violated Cal. Civ. Code § 1750, *et seq.*, as described above and below by, at a minimum, representing that Class Vehicles have characteristics, uses, benefits, and qualities which they do not have; representing that Class Vehicles are of a particular standard, quality, and grade when they are not; advertising Class Vehicles with the intent not to sell or lease them as advertised; and representing that the subject of a transaction involving Class Vehicles has been supplied in accordance with a previous representation when it has not.

39

173.    In the course of their business, Defendant intentionally or negligently concealed and suppressed material facts concerning the serious and dangerous engine defect affecting the Class Vehicles. Defendant concealed the truth about the defect and failed to make any adequate effort to remedy it despite the fact that it knew about the Roof Defect for years.

174.    Even though Defendant knew of the Roof Defect before any of the Class Vehicles were sold, they continued to produce and market Class Vehicles for sale. Plaintiff and Class Members purchased or leased their Vehicles after Defendant had notice of the defect.

175.    Plaintiff and Class Members had no way of discerning that Defendant had falsely and deceptively concealed the Roof Defect unless and until the defect manifested in the event of a rollover accident. Plaintiff and Class Members could not unravel this deception on their own.

176.    Defendant's actions constitute a violation of the CLRA. Defendant knew the true nature of these vehicles as a result of pre-sale durability testing and extensive research regarding roof crush resistance.

177.    Defendant owed Plaintiff a duty to disclose the defect and its resulting safety risks because Defendant:

A.    Possessed exclusive knowledge that they were manufacturing, selling, and distributing vehicles throughout the United States with a dangerous defect;

B.    Intentionally concealed the foregoing from regulators, Plaintiff, and Class members; and/or

C.    Made misleading representations, via advertisements regarding the Safety Canopy System in Plaintiff's 2016 Vehicle, concerning the safety of the Class Vehicles in the event of a rollover accident, while actually purposefully withholding material facts from Plaintiff and Class Members that contradicted these representations.

40

178.    Defendant's unfair and deceptive acts or practices were likely to and did in fact deceive reasonable consumers, including Plaintiff, about the true safety, roadworthiness, and value of the Class Vehicles.

179.    Plaintiff and Class Members have suffered ascertainable loss and actual damages as a direct and proximate result of Defendant's concealment of and failure to disclose material information. Plaintiff and Class Members who purchased or leased Class Vehicles would not have done so at all, or would have paid significantly less for them, if their true nature was disclosed by Defendant and/or known by Plaintiff and Class Members.

180.    Meanwhile, Defendant had an ongoing duty to all of their customers to refrain from unfair and deceptive practices under the CLRA. All owners and lessees of Class Vehicles suffered ascertainable loss as a result of Defendant' deceptive and unfair acts and practices made in the course of Defendant' business.

181.    Defendant's violations present a continuing risk to Plaintiff as well as to the general public. Defendant' unlawful acts and practices complained of herein affect the public interest.

182.    Plaintiff provided notice to Ford of its CLRA violations pursuant to California Civil Code § 1782(a) on November 8, 2022, and currently seek injunctive relief. Plaintiff hereby reserves his right to amend this complaint to seek monetary damages under the CLRA after the 30-day notice period expires.

183.    Plaintiff seeks an order enjoining Defendant' unfair or deceptive acts or practices and reasonable attorneys' fees and costs under Cal. Civ. Code § 1780(e), and any other just and proper relief available under the CLRA.

## COUNT EIGHT — BREACH OF THE IMPLIED
## WARRANTY OF MARCHANTABILITY
## (CAL. COM. CODE § § 2314 AND 10212)

184.    Plaintiff Tellez realleges and incorporates by reference all paragraphs as though fully set forth herein.

41

185.    Plaintiff Tellez asserts this claim on behalf of himself and the California Subclass against Defendant Ford.

186.    Ford is and was at all relevant times a "merchant" with respect to motor vehicles under California Commercial Code §§ 2104(1) and 10103(c), and a "seller" of motor vehicles under § 2103(1)(d).

187.    With respect to leases, Ford is and was at all relevant times relevant a "lessor" of motor vehicles under Cal. Com. Code § 10103(a)(16).

188.    The Class Vehicles are and were at all relevant times "goods" within the meaning of California Commercial Code §§ 2105(1) and 10103(a)(8).

189.    Ford was at all relevant times the manufacturer, distributor, warrantor, and/or seller of the Class Vehicles. Ford knew or had reason to know of the specific use for which the Class Vehicles were purchased.

190.    A warranty that the Class Vehicles were in merchantable condition and fit for the ordinary purpose for which vehicles are used is implied by law pursuant to California Commercial Code §§ 2314 and 10212.

191.    Ford provided Plaintiff and the Class Members with an implied warranty that the Class Vehicles, and any parts thereof, are merchantable and fit for the ordinary purposes for which they were sold. Ford impliedly warranted that the Class Vehicles were of merchantable quality and fit for such use. This implied warranty included, among other things: (i) a warranty that the vehicles Ford manufactured, supplied, distributed, and/or sold were safe and reliable for providing transportation, and would not experience premature and catastrophic failure; and (ii) a warranty that the Class Vehicles would be fit for their intended use while being operated.

192.    However, the Class Vehicles the time of sale and thereafter were and are not vehicles are not fit for their ordinary purpose of providing reasonably reliable and safe transportation at the time of

42

sale or thereafter because the passenger cab can be crushed under the weight of the Vehicles during a rollover accident, causing serious injury or death to Vehicle occupants.

193.    Therefore, the Class Vehicles are not fit for their particular purpose of providing safe and reliable transportation.

194.    Ford impliedly warranted that the Class Vehicles were of merchantable quality and fit for such use. This implied warranty included, among other things: (i) a warranty that the vehicles Ford manufactured, supplied, distributed, and/or sold were safe and reliable for providing transportation, and would not experience catastrophic failure in the event of a rollover accident; and (ii) a warranty that the Class Vehicles would be fit for their intended use while being operated.

195.    Plaintiff notified Ford of its breach by letter on November 8, 2022, though he was not required to do so because affording Ford a reasonable opportunity to cure its breaches would have been futile. In any event, Ford knows about the Roof Defect but instead chose to conceal it as a means of avoiding compliance with its warranty obligations.

196.    Plaintiff and the Class Members have had sufficient dealings with Ford or its agents to establish privity of contract. Privity is not required in this case, however, because Plaintiff and the Class Members are intended third-party beneficiaries of contracts between Ford and its authorized dealers and are intended beneficiaries of Ford's implied warranties. The dealers were not intended to be the ultimate consumers of Class Vehicles, and the warranties were designed for and intended to benefit the ultimate consumers only.

197.    As a direct and proximate result of the breach of said implied warranty, Plaintiff and the Class Members sustained the damages herein set forth.

198.    Plaintiff and the Class Members are, therefore, entitled to damages in an amount to be proven at the time of trial.

43

**COUNT NINE — VIOLATIONS OF THE SONG-BEVERLY ACT – BREACH OF THE
IMPLIED WARRANTY OF MERCHANTABILITY
(CAL. CIV. CODE §§ 1792, 1791.1, *ET SEQ.*)**

199.    Plaintiff Tellez realleges and incorporates by reference all paragraphs as though fully set forth herein.

200.    Plaintiff Tellez asserts this claim on behalf of himself and the California Subclass against Defendant Ford.

201.    Plaintiffs and California Subclass Members are "buyers" within the meaning of Cal. Civ. Code § 1791(b).

202.    The Class Vehicles are "consumer goods" within the meaning of Cal. Civ. Code § 1791(a).

203.    Ford is the "manufacturer" of the Class Vehicles within the meaning of Cal. Civ. Code § 1791(j).

204.    Ford impliedly warranted to Plaintiff and the Class Members that the Class Vehicles were "merchantable" within the meaning of Cal. Civ. Code §§ 1791.1(a) & 1792. However, the Class Vehicles contain the Roof Defect and do not have the quality that buyers would reasonably expect; therefore, they were not merchantable.

205.    Contrary to the applicable implied warranties, the Class Vehicles were not merchantable when sold or leased because they contain the Roof Defect and pose an unreasonable risk of serious injury or death to drivers and occupants as described herein. The Class Vehicles share a common defect in that they are all equipped with the Roof Defect that makes the vehicles susceptible to the passenger cab being crushed in the event of a rollover accident, causing an unreasonable risk of serious injury or death to owners and lessees of the Class Vehicles. This Roof Defect renders the Class Vehicles, when sold or leased and at all times thereafter, unmerchantable and unfit for their ordinary use.

44

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21

206.    Ford's actions, as complained of herein, breached the implied warranty that the Class Vehicles were of merchantable quality and fit for such use in violation of California Civil Code §§ 1792 and 1791.1.

### COUNT TEN — FRAUDULENT MISREPRESENTATION
### (as to Plaintiff Tellez's 2016 Class Vehicle)

207.    Plaintiff Tellez realleges and incorporates by reference all paragraphs as though fully set forth herein.

208.    Plaintiff Tellez asserts this claim on behalf of himself and the California Subclass against Defendant Ford.

209.    In its advertisements, Ford explicitly represented that the 2011–16 Class Vehicles were equipped with the Safety Canopy System to provide increased protection in the event of a rollover of the vehicle. Ford communicated through these advertisements that the Class Vehicles were safe in the event of a rollover accident.

210.    Ford further affirmatively misrepresented to Plaintiff in advertising and other forms of communications, including standard and uniform material provided with each vehicle, that the Class Vehicles it was selling had no significant defects and would perform and operate properly, including with respect to the Safety Canopy System. Ford knew that these representations were false when made.

211.    In fact, the 2016 Class Vehicle purchased by Plaintiff, and the other 2011–16 Class Vehicles purchased or leased by Class Members were, in fact, defective, unsafe, and unreliable, because the Roof Defect rendered the Safety Canopy System ineffective in the event of a rollover accident.

212.    Ford has known since before the introduction of the Safety Canopy System in the 2011 Class Vehicles that the Roof Defect existed, and that the Safety Canopy System would be rendered ineffective in the event of a rollover accident because the roof would collapse. Even so, Ford made specific representations about the safety of the Class Vehicles in the event of a rollover accident when it

advertised its Safety Canopy System. Ford broadcast those advertisements with the intent that members of the general public would rely on these representations in making their purchases.

213.  A reasonable consumer would have done just that, expecting that the Class Vehicles would not be defective or pose a serious safety risk, and that Ford's representations about the Safety Canopy System would be accurate.

214.  Plaintiff and Class Members relied on Ford's affirmative misrepresentations regarding the safety of the Class Vehicles, including its misrepresentations specifically regarding the Safety Canopy System, when deciding to purchase or lease the Class Vehicles. Had they known the true nature of the Class Vehicles, they would not have purchased or leased the Class Vehicles or would have paid less for them. Plaintiff and Class Members were therefore fraudulently induced to purchase or lease the Class Vehicles with the defects alleged herein, and the resulting harms.

215.  To the extent that Ford's conduct was willful, oppressive, or malicious, Plaintiff Tellez and Class Members are entitled to an award of punitive damages.

**COUNT ELEVEN — FRAUD BY CONCEALMENT**

216.  Plaintiff Tellez realleges and incorporates by reference all paragraphs as though fully set forth herein.

217.  Plaintiff Tellez asserts this claim on behalf of himself and the California Subclass against Defendant Ford.

218.  The Class Vehicles that Plaintiff and Class Members purchased or leased were defective and unsafe because the roof of the vehicles are subject to collapse in the event of a rollover accident, crushing the drivers and occupants of the passenger cab and causing serious injury or death.

219.  Ford intentionally concealed the Roof Defect and acted with reckless disregard for the truth when it failed to disclose to consumers for years that the Vehicle roofs were not strong enough to withstand the weight of the Vehicles, and would collapse in the event of a rollover accident. Further,

46

Ford advertised these Vehicles as appropriate for off-road driving, which has an increased risk of rollover events.

220.    Ford had a duty to disclose this material safety information to Plaintiff and Class Members because it knew about the safety hazards posed by the Roof Defect, and instead concealed the defect from the general public.

221.    Plaintiff and Class Members did not know about the Roof Defect and could not have discovered it through reasonably diligent investigation before Ford disclosed it—or until they experienced a rollover accident and the roof of their Vehicles collapsed, causing serious injury, paralysis, or even death.

222.    But for Ford's fraudulent omissions of material information, Plaintiff and Class Members would not have purchased or leased the Class Vehicles, or would have paid less for them. Plaintiff and Class Members have sustained damage because they purchased or leased Vehicles that were not as represented, and because they now own or lease Class Vehicles that are unsafe and never should have been placed in the stream of commerce. Accordingly, Ford is liable to Plaintiff and Class Members for damages in an amount to be proven at trial for the lost benefit of the bargain and overpayment at the time of purchase or lease, and/or for the diminished value of the Class Vehicles.

223.    Ford's acts were done wantonly, deliberately, with intent to defraud, in reckless disregard of the rights of Plaintiff and Class Members, and to enrich themselves. Ford's misconduct warrants an assessment of punitive damages in an amount sufficient to deter such conduct in the future, which amount shall be determined according to proof at trial.

**C.    Claims Brought on Behalf of the Kentucky Subclass**

**COUNT TWELVE — BREACH OF THE IMPLIED WARRANTY OF MERCHANTABILITY
(KY. REV. STAT. § § 225.2-314 AND 355.2A-212)**

224.    Plaintiff Thomas realleges and incorporates by reference all paragraphs as though fully set forth herein.

47

225.    Plaintiff Thomas asserts this claim on behalf of himself and the Kentucky Subclass against Defendant Ford.

226.    Ford was at all relevant times a "merchant" with respect to motor vehicles under Ky. Rev. Stat. §§ 355.2-104(1) & 355.2A-103(3), and a "seller" of motor vehicles under Ky. Rev. Stat. § 355.2-103(1)(d).

227.    With respect to leases, Ford was at all relevant times a "lessor" of motor vehicles under Ky. Rev. Stat. §§ 355.2-105(1) & 355.2A-103(1)(h).

228.    A warranty that the Class Vehicles were in merchantable condition and fit for the ordinary purpose for which vehicles are used is implied by law pursuant to Ky. Rev. Stat. §§ 335.2-314 & 355.2A-212.

229.    Ford sold and/or leased Class Vehicles that were not in merchantable condition and/or fit for their ordinary purpose in violation of the implied warranty. The Class Vehicles were not in merchantable condition due to the Roof Defect as described herein.

230.    Ford's breach of the implied warranty of merchantability caused damage to Plaintiff and the Class Members. The amount of damages will be proven at trial.

## COUNT THIRTEEN — FRAUD BY CONCEALMENT

231.    Plaintiff Thomas realleges and incorporates by reference all paragraphs as though fully set forth herein.

232.    Plaintiff Thomas asserts this claim on behalf of himself and the Kentucky Subclass against Defendant Ford.

233.    As set forth above, Ford concealed and/or suppressed material facts concerning the Class Vehicles' safety.

234.    Ford actively concealed and/or suppressed these material facts, in whole or in part, with the intent to induce Plaintiff and the Class Members to purchase the Class Vehicles at a higher price than their true value.

48

235.   Ford still has not made full and adequate disclosure of the Roof Defect.

236.   Plaintiff and the Class Members were unaware of these omitted material facts, and would not have acted as they did if they had known of the Roof Defect. Plaintiff and the Class Members' actions were justified. Ford had exclusive control of the material facts and such facts were not known to the public, Plaintiff Rains, or the Oregon Subclass.

237.   As a result of the concealment and/or suppression of the facts, Plaintiff and the Class Members sustained damage. For those of Plaintiff and the Class Members who elect to affirm the sale, these damages, include the difference between the actual value of that which Plaintiff and the Class Members paid and the actual value of that which they received, together with additional damages arising from the sales transaction, amounts expended in reliance upon the fraud, compensation for loss of use and enjoyment of the property, and/or lost profits. For any Plaintiff and Class Member who wants to rescind their purchases, then such Plaintiff and Class Members are entitled to restitution and consequential damages.

238.   Ford's acts were done maliciously, oppressively, deliberately, with intent to defraud, and in reckless disregard of Plaintiff's and the Class Members' rights and well-being. Ford's conduct warrants an assessment of punitive damages in an amount sufficient to deter such conduct in the future, which amount is to be determined according to proof.

**COUNT FOURTEEN — UNJUST ENRICHMENT**

239.   Plaintiff Thomas realleges and incorporates by reference all paragraphs as though fully set forth herein.

240.   Plaintiff Thomas asserts this claim on behalf of himself and the Kentucky Subclass against Defendant Ford.

241.   As a result of its wrongful and fraudulent acts and omissions, as set forth above, pertaining to the design and/or manufacturing defect of their vehicles and the concealment of the Roof

Defect, Ford charged a higher price for their vehicles than the vehicles' true value and Ford obtained monies which rightfully belong to Plaintiff and the Class Members.

242.     Ford enjoyed the benefit of increased financial gains, to the detriment of Plaintiff and the Class Members, who paid a higher price for vehicles which actually had lower values. It would be inequitable and unjust for Ford retain these wrongfully obtained profits.

243.     Plaintiff Thomas, therefore, seeks an order establishing Ford as a constructive trustee of the profits unjustly obtained, plus interest.

**D.     Claims Brought on Behalf of the North Carolina Subclass**

### COUNT FIFTEEN — VIOLATION OF THE NORTH CAROLINA UNFAIR AND DECEPTIVE TRADE PRACTICES ACT (N.C. GEN. STAT. § § 75-1.1, *et seq.*)

244.     Plaintiff Thomas realleges and incorporates by reference all paragraphs as though fully set forth herein.

245.     Plaintiff Thomas asserts this claim on behalf of himself and the North Carolina Subclass against Defendant Ford.

246.     Ford, Plaintiff Thomas, and the Class Members are "persons" within the meaning of N.C. Gen. Stat. § 75-1.1, *et seq.*

247.     Ford's acts and practices complained of herein were performed in the course of their trade or business and thus occurred in and affected "commerce" as defined in N.C. Gen. Stat. § 75-1.1(b).

248.      The North Carolina Unfair and Deceptive Trade Practices Act ("North Carolina UDTPA") makes unlawful "[u]nfair methods of competition in or affecting commerce, and unfair or deceptive acts or practices in or affecting commerce[,]" and the North Carolina UDTPA provides a private right of action for any person injured "by reason of any act or thing done by any other person, firm or corporation in violation of" the law. N.C. Gen. Stat. § 75-16.

249.     In the course of its business, Ford violated the North Carolina UDTPA.

50

250.     As detailed herein, Ford represented that the Class Vehicles have characteristics, uses, or benefits that they do not have; represented that the Class Vehicles are of a particular standard, quality, and grade when they are not; advertised the Class Vehicles with the intent not to sell or lease them as advertised; engaged in other conduct which created a likelihood of confusion or of misunderstanding; and/or used or employed deception, fraud, false pretense, false promise, or misrepresentation, or the concealment, suppression or omission of a material fact with intent that others rely upon such concealment, suppression or omission, in connection with the advertisement and sale/lease of the Class Vehicles.

251.     Ford concealed the true characteristics of the roof crush resistance and safety of the Class Vehicles, which was material to Plaintiff and the Class Members, as Ford intended. Had they known the truth, Plaintiff and the Class Members would not have purchased or leased the Class Vehicles, or would have paid significantly less for them.

252.     Plaintiff and the Class Members had no way of learning of the Roof Defect because of its latent nature. Plaintiffs and the Class Members did not, and could not, unravel Ford's deception on their own.

253.     Ford had an ongoing duty to Plaintiff and the Class Members to refrain from unfair and deceptive practices under the North Carolina UDTPA in the course of its business. Specifically, Ford owed Plaintiff and the Class Members a duty to disclose all material facts concerning the Roof Defect because it possessed exclusive knowledge and because it intentionally concealed the Defect from Plaintiff and the Class Members.

254.      Plaintiff and the Class Members have suffered an ascertainable loss of money or property as a direct and proximate result of Ford's willful use or employment of unlawful methods, acts or practices.

255.     Ford's violations present a continuing risk to Plaintiff and the Class Members, as well as to the general public. Ford's unlawful acts and practices complained of herein affect the public interest.

51

256.     Pursuant to N.C. Gen. Stat. § 75-16, Plaintiff and the Class Members seek an order enjoining Ford's unfair and/or deceptive acts and practices, and awarding damages, punitive damages, and any other just and proper relief available under the North Carolina UDTPA.

### COUNT SIXTEEN — BREACH OF THE IMPLIED WARRANTY OF MERCHANTABILITY (N.C. GEN. STAT. § § 25-2-314 AND 252A-212)

257.     Plaintiff Thomas realleges and incorporates by reference all paragraphs as though fully set forth herein.

258.     Plaintiff Thomas asserts this claim on behalf of himself and the North Carolina Subclass against Defendant Ford.

259.     Ford was at all relevant times a "merchant" with respect to motor vehicles under N.C. Gen. Stat. § 25-2-104(1) and a "seller" of motor vehicles under N.C. Gen. Stat. § 25-2-103(1)(d).

260.     With respect to leases, Ford was at all relevant times a "lessor" of motor vehicles under N.C. Gen. Stat. § 25-2A-103(1)(p).

261.     The Class Vehicles are and were at all relevant times "goods" within the meaning of N.C. Gen. Stat. §§ 25-2-105(1) & 25-2A-103(1)(h).5.

262.     A warranty that the Class Vehicles were in merchantable condition and fit for the ordinary purpose for which vehicles are used is implied by law pursuant to N.C. Gen. Stat. §§ 25-2-314 & 25-2A-212.

263.     Ford sold and/or leased Class Vehicles that were not in merchantable condition and/or fit for their ordinary purpose in violation of the implied warranty. The Class Vehicles were not in merchantable condition due to the Roof Defect as described herein.

264.     Ford's breach of the implied warranty of merchantability caused damage to Plaintiff and the Class Members. The amount of damages will be proven at trial.

## COUNT SEVENTEEN — FRAUD BY CONCEALMENT

265.    Plaintiff Thomas realleges and incorporates by reference all paragraphs as though fully set forth herein.

266.    Plaintiff Thomas asserts this claim on behalf of himself and the North Carolina Subclass against Defendant Ford.

267.    As set forth above, Ford concealed and/or suppressed material facts concerning the Class Vehicles' safety.

268.    Ford actively concealed and/or suppressed these material facts, in whole or in part, with the intent to induce Plaintiff and the Class Members to purchase the Class Vehicles at a higher price than their true value.

269.    Ford still has not made full and adequate disclosure of the Roof Defect.

270.    Plaintiff and the Class Members were unaware of these omitted material facts, and would not have acted as they did if they had known of the Roof Defect. Plaintiff and the Class Members' actions were justified. Ford had exclusive control of the material facts and such facts were not known to the public, Plaintiff Rains, or the Oregon Subclass.

271.    As a result of the concealment and/or suppression of the facts, Plaintiff and the Class Members sustained damage. For those of Plaintiff and the Class Members who elect to affirm the sale, these damages, include the difference between the actual value of that which Plaintiff and the Class Members paid and the actual value of that which they received, together with additional damages arising from the sales transaction, amounts expended in reliance upon the fraud, compensation for loss of use and enjoyment of the property, and/or lost profits. For any Plaintiff and Class Member who wants to rescind their purchases, then such Plaintiff and Class Members are entitled to restitution and consequential damages.

272.    Ford's acts were done maliciously, oppressively, deliberately, with intent to defraud, and in reckless disregard of Plaintiff's and the Class Members' rights and well-being. Ford's conduct

53

warrants an assessment of punitive damages in an amount sufficient to deter such conduct in the future, which amount is to be determined according to proof.

## COUNT EIGHTEEN — UNJUST ENRICHMENT

273.    Plaintiff Thomas realleges and incorporates by reference all paragraphs as though fully set forth herein.

274.    Plaintiff Thomas asserts this claim on behalf of himself and the North Carolina Subclass against Defendant Ford.

275.    As a result of its wrongful and fraudulent acts and omissions, as set forth above, pertaining to the design and/or manufacturing defect of their vehicles and the concealment of the Roof Defect, Ford charged a higher price for their vehicles than the vehicles' true value and Ford obtained monies which rightfully belong to Plaintiff and the Class Members.

276.    Ford enjoyed the benefit of increased financial gains, to the detriment of Plaintiff and the Class Members, who paid a higher price for vehicles which actually had lower values. It would be inequitable and unjust for Ford retain these wrongfully obtained profits.

277.    Plaintiff Thomas, therefore, seeks an order establishing Ford as a constructive trustee of the profits unjustly obtained, plus interest.

**E.    Claims Brought on Behalf of the Oklahoma Subclass**

### COUNT NINETEEN — VIOLATION OF THE OKLAHOMA CONSUMER PROTECTION ACT
### (OKLA. STAT. TIT. 15 § 751, *et seq.*)

278.    Plaintiff Griffit realleges and incorporates by reference all paragraphs as though fully set forth herein.

279.    Plaintiff Griffit asserts this claim on behalf of himself and the Oklahoma Subclass against Defendant Ford.

280.    Ford, Plaintiff Griffit, and the Class Members are "persons" within the meaning of Okla. Stat. Tit. 15 § 752.1.

281.    At all relevant times, Ford was engaged in "the course of business" within the meaning of Okla. Stat. Tit. 15 § 753.

282.    The Oklahoma Consumer Protection Act ("Oklahoma CPA") prohibits numerous unlawful acts, including misleading representations, false advertisements, and false statements. Okla. Stat. Tit. 15 § 753.

283.    In the course of its business, Ford violated the Oklahoma CPA.

284.    As detailed herein, Ford represented that the Class Vehicles have characteristics, uses, or benefits that they do not have; represented that the Class Vehicles are of a particular standard, quality, and grade when they are not; and advertised the Class Vehicles with the intent not to sell or lease them as advertised.

285.    Ford concealed the true characteristics of the roof crush resistance and safety of the Class Vehicles, which was material to Plaintiff and the Class Members, as Ford intended. Had they known the truth, Plaintiff and the Class Members would not have purchased or leased the Class Vehicles, or would have paid significantly less for them.

286.    Plaintiff and the Class Members had no way of learning of the Roof Defect because of its latent nature. Plaintiffs and the Class Members did not, and could not, unravel Ford's deception on their own.

287.    Ford had an ongoing duty to Plaintiff and the Class Members to refrain from unfair and deceptive practices under the Oklahoma CPA in the course of its business. Specifically, Ford owed Plaintiff and the Class Members a duty to disclose all material facts concerning the Roof Defect because it possessed exclusive knowledge and because it intentionally concealed the Defect from Plaintiff and the Class Members.

288.    Plaintiff and the Class Members have suffered an ascertainable loss of money or property as a direct and proximate result of Ford's willful use or employment of unlawful methods, acts or practices.

55

289.    Ford's violations present a continuing risk to Plaintiff and the Class Members, as well as to the general public. Ford's unlawful acts and practices complained of herein affect the public interest.

290.    Pursuant to Okla. Stat. Tit. 15 § 761.1, Plaintiff and the Class Members seek an order enjoining Ford's unfair and/or deceptive acts and practices, and awarding damages, punitive damages, and any other just and proper relief available under the Oklahoma CPA.

**COUNT TWENTY — BREACH OF THE IMPLIED WARRANTY OF MERCHANTABILITY (OKLA. STAT. TIT. 12A § § 2-314 AND 2A-212)**

291.    Plaintiff Griffit realleges and incorporates by reference all paragraphs as though fully set forth herein.

292.    Plaintiff Griffit asserts this claim on behalf of himself and the Oklahoma Subclass against Defendant Ford.

293.    Ford was at all relevant times a "merchant" with respect to motor vehicles under Okla. Stat. Tit. 12A §§ 2-104(1) & 2-1103(3) and a "seller" of motor vehicles under Okla. Stat. Tit. 12A § 2A-103(1)(t).

294.    With respect to leases, Ford was at all relevant times a "lessor" of motor vehicles under Okla. Stat. Tit. 12A § 2A-103(1)(p).

295.    The Class Vehicles are and were at all relevant times "goods" within the meaning of Okla. Stat. Tit. 12A §§ 2-105(1) & 2A-103(1)(h).

296.    A warranty that the Class Vehicles were in merchantable condition and fit for the ordinary purpose for which vehicles are used is implied by law pursuant to Okla. Stat. Tit. 12A §§ 2-314 & 2A-212.

297.    Ford sold and/or leased Class Vehicles that were not in merchantable condition and/or fit for their ordinary purpose in violation of the implied warranty. The Class Vehicles were not in merchantable condition due to the Roof Defect as described herein.

56

298.     Ford's breach of the implied warranty of merchantability caused damage to Plaintiff and the Class Members. The amount of damages will be proven at trial.

### COUNT TWENTY-ONE — FRAUD BY CONCEALMENT

299.     Plaintiff Griffit realleges and incorporates by reference all paragraphs as though fully set forth herein.

300.     Plaintiff Griffit asserts this claim on behalf of himself and the Oklahoma Subclass against Defendant Ford.

301.     As set forth above, Ford concealed and/or suppressed material facts concerning the Class Vehicles' safety.

302.     Ford actively concealed and/or suppressed these material facts, in whole or in part, with the intent to induce Plaintiff and the Class Members to purchase the Class Vehicles at a higher price than their true value.

303.     Ford still has not made full and adequate disclosure of the Roof Defect.

304.     Plaintiff and the Class Members were unaware of these omitted material facts, and would not have acted as they did if they had known of the Roof Defect. Plaintiff and the Class Members' actions were justified. Ford had exclusive control of the material facts and such facts were not known to the public, Plaintiff Rains, or the Oregon Subclass.

305.     As a result of the concealment and/or suppression of the facts, Plaintiff and the Class Members sustained damage. For those of Plaintiff and the Class Members who elect to affirm the sale, these damages, include the difference between the actual value of that which Plaintiff and the Class Members paid and the actual value of that which they received, together with additional damages arising from the sales transaction, amounts expended in reliance upon the fraud, compensation for loss of use and enjoyment of the property, and/or lost profits. For any Plaintiff and Class Member who wants to rescind their purchases, then such Plaintiff and Class Members are entitled to restitution and consequential damages.

306.     Ford's acts were done maliciously, oppressively, deliberately, with intent to defraud, and in reckless disregard of Plaintiff's and the Class Members' rights and well-being. Ford's conduct warrants an assessment of punitive damages in an amount sufficient to deter such conduct in the future, which amount is to be determined according to proof.

**COUNT TWENTY-TWO — UNJUST ENRICHMENT**

307.     Plaintiff Griffit realleges and incorporates by reference all paragraphs as though fully set forth herein.

308.     Plaintiff Griffit asserts this claim on behalf of himself and the Oklahoma Subclass against Defendant Ford.

309.     As a result of its wrongful and fraudulent acts and omissions, as set forth above, pertaining to the design and/or manufacturing defect of their vehicles and the concealment of the Roof Defect, Ford charged a higher price for their vehicles than the vehicles' true value and Ford obtained monies which rightfully belong to Plaintiff and the Class Members.

310.     Ford enjoyed the benefit of increased financial gains, to the detriment of Plaintiff and the Class Members, who paid a higher price for vehicles which actually had lower values. It would be inequitable and unjust for Ford retain these wrongfully obtained profits.

311.     Plaintiff Griffit, therefore, seeks an order establishing Ford as a constructive trustee of the profits unjustly obtained, plus interest.

**F.     Claims Brought on Behalf of the Oregon Subclass**

**COUNT TWENTY-THREE — VIOLATIONS OF THE OREGON UNLAWFUL TRADE PRACTICES ACT**
**(OR. REV. STAT. § 646.605 THROUGH 646.656)**

312.     Plaintiff Rains realleges and incorporates by reference all paragraphs as though fully set forth herein.

313.     Plaintiff Rains asserts this claim on behalf of himself and the Oregon Subclass against Defendant Ford.

314.    Defendant and Plaintiff are "persons" under the Oregon Unlawful Trade Practices Act, ORS § 646.605(4).

315.    Plaintiff purchased his Class Vehicles primarily for personal, family or household purposes and thus his Class Vehicle is a "good" under ORS § 646.605(6)(a).

316.    Ford is and was engaged in "trade" and "commerce" as defined by ORS § 646.605(8).

317.    ORS § 646.607 provides, in relevant part, that a "person engages in an unlawful trade practice if in the course of the person's business, vocation or occupation the person . . . [e]mploys any unconscionable tactic in connection with selling . . . goods or services."

318.    Ford knew or should have known that the Class Vehicles' roofs were defectively designed or manufactured, would fail prematurely, and were not suitable for their intended use.

319.    Ford employed unconscionable tactics in selling the Class Vehicles by not giving Plaintiff and the Class Members sufficient notice or warning regarding the Roof Defect, intending that Plaintiff and the Class Members rely upon Ford's omissions when purchasing the Class Vehicles. Plaintiff and the Class Members were deceived by Ford's concealment of the Roof Defect.

320.    Ford also engaged in unlawful and deceptive practices in violation of ORS § 646.608 by representing that the Class Vehicles have characteristics, uses, benefits, quantities and qualities that they do not have (ORS § 646.608(e)); representing that the Class Vehicles are of a particular standard, quality or grade when they are of another (ORS § 646.608(g)); concurrently with tender or delivery of the Class Vehicles, failing to disclose known material defects or material nonconformities (ORS § 646.608(t)); and engaging in other unfair or deceptive conduct (ORS § 646.608(u)).

321.    Ford also engaged in unlawful and deceptive practices in violation of ORS §§ 646.607 and 646.608 by failing to provide Plaintiff and the Class Members the full cost to repair the Class Vehicles.

322.    Ford knew or should have known that its conduct was a violation of the Oregon Unfair Trade Practices Act, ORS § 646.605 - .656, and therefore its conduct was willful. ORS § 646.605(10).

59

323.    Plaintiff and the Class Members have suffered an ascertainable loss of money or property as a direct and proximate result of Ford's willful use or employment of unlawful methods, acts or practices.

324.    Pursuant to ORS § 646.638, Plaintiff and the Class Members seek an order enjoining Ford's unfair and/or deceptive practices, actual damages, punitive damages, attorney's fees and costs, and any other just and proper relief available under the Oregon UTPA.

325.    Pursuant to ORS § 646.638(2), Plaintiff will serve the Oregon Attorney General with a copy of this Complaint.

**COUNT TWENTY-FOUR — BREACH OF THE IMPLIED WARRANTY OF MERCHANTABILITY**
**(OR. REV. STAT. § 72.8020 *ET SEQ.*)**

326.    Plaintiff Rains realleges and incorporates by reference all paragraphs as though fully set forth herein.

327.    Plaintiff Rains asserts this claim on behalf of himself and the Oregon Subclass against Defendant Ford.

328.    The Class Vehicles are "consumer goods" as defined in ORS § 72.8010(1).

329.    Plaintiff and the Class Members are "buyers" and "retail buyers" as defined in ORS § 72.8010(2).

330.    Ford is and was at all relevant times a "manufacturer" as defined in ORS § 72.8010(3) with respect to the Class Vehicles.

331.    Pursuant to ORS § 72.8020, Ford impliedly warranted that the Class Vehicles are fit for the ordinary purposes for which they are used: transporting the driver and passengers in reasonable safety during normal operation, without unduly endangering them or members of the public.

332.    By marketing, advertising, distributing, and selling Class Vehicles with the Roof Defect, Ford breached the implied warranty that the Class Vehicles were merchantable and safe for use as personal transportation.

60

333.    The Roof Defect was part of the Class Vehicles at the time they left Ford's manufacturing facilities and at the time they were sold or leased to Plaintiff and the Class Members.

334.    Plaintiff and the Class Members have performed the duties required of them under the terms of the warranties, except as may have been excused or prevented by Ford's conduct or by operation of law in light of Ford's unconscionable conduct.

335.    Ford received timely notice by letter on November 8, 2022 about the Roof Defect but has failed to rectify the problem and refused to offer an effective remedy.

336.    Plaintiff and the Class Members have had sufficient dealings with Ford or its agents to establish privity of contract. Privity is not required in this case, however, because Plaintiff and the Class Members are intended third-party beneficiaries of contracts between Ford and its authorized dealers and are intended beneficiaries of Ford's implied warranties. The dealers were not intended to be the ultimate consumers of Class Vehicles, and the warranties were designed for and intended to benefit the ultimate consumers only. Further, Plaintiff and Class Members are within the distributive chain of the Class Vehicles.

337.    As a direct and proximate result of Ford's breach of the implied warranty of merchantability, Plaintiff and the Class Members suffered economic damage, including loss attributable to the diminished value of the Class Vehicles.

### COUNT TWENTY-FIVE — FRAUD BY CONCEALMENT

338.    Plaintiff Rains realleges and incorporates by reference all paragraphs as though fully set forth herein.

339.    Plaintiff Rains asserts this claim on behalf of himself and the Oregon Subclass against Defendant Ford.

340.    As set forth above, Ford concealed and/or suppressed material facts concerning the Class Vehicles' safety.

341.    Ford actively concealed and/or suppressed these material facts, in whole or in part, with the intent to induce Plaintiff and the Class Members to purchase the Class Vehicles at a higher price than their true value.

342.    Ford still has not made full and adequate disclosure of the Roof Defect.

343.    Plaintiff and the Class Members were unaware of these omitted material facts, and would not have acted as they did if they had known of the Roof Defect. Plaintiff and the Class Members' actions were justified. Ford had exclusive control of the material facts and such facts were not known to the public, Plaintiff Rains, or the Oregon Subclass.

344.    As a result of the concealment and/or suppression of the facts, Plaintiff and the Class Members sustained damage. For those of Plaintiff and the Class Members who elect to affirm the sale, these damages, include the difference between the actual value of that which Plaintiff and the Class Members paid and the actual value of that which they received, together with additional damages arising from the sales transaction, amounts expended in reliance upon the fraud, compensation for loss of use and enjoyment of the property, and/or lost profits. For any Plaintiff and Class Member who wants to rescind their purchases, then such Plaintiff and Class Members are entitled to restitution and consequential damages.

345.    Ford's acts were done maliciously, oppressively, deliberately, with intent to defraud, and in reckless disregard of Plaintiff's and the Class Members' rights and well-being. Ford's conduct warrants an assessment of punitive damages in an amount sufficient to deter such conduct in the future, which amount is to be determined according to proof.

### COUNT TWENTY-SIX — UNJUST ENRICHMENT

346.    Plaintiff Rains realleges and incorporates by reference all paragraphs as though fully set forth herein.

347.    Plaintiff Rains asserts this claim on behalf of himself and the Oregon Subclass against Defendant Ford.

62

348.     As a result of its wrongful and fraudulent acts and omissions, as set forth above, pertaining to the design and/or manufacturing defect of their vehicles and the concealment of the Roof Defect, Ford charged a higher price for their vehicles than the vehicles' true value and Ford obtained monies which rightfully belong to Plaintiff and the Class Members.

349.     Ford enjoyed the benefit of increased financial gains, to the detriment of Plaintiff and the Class Members, who paid a higher price for vehicles which actually had lower values. It would be inequitable and unjust for Ford retain these wrongfully obtained profits.

350.     Plaintiff Rains, therefore, seeks an order establishing Ford as a constructive trustee of the profits unjustly obtained, plus interest.

**G.     Claims Brought on Behalf of the Washington Subclass**

### COUNT TWENTY-SEVEN — VIOLATIONS OF THE CONSUMER PROTECTION ACT
### (REV. CODE WASH. ANN. § § 19.86.010, ET SEQ.)

351.     Plaintiff Bright realleges and incorporates by reference all paragraphs as though fully set forth herein.

352.     Plaintiff Bright asserts this claim on behalf of himself and the Washington Subclass against Defendant Ford.

353.     Ford's conduct as set forth herein constitutes unfair or deceptive acts or practices, including, but not limited to, Ford's manufacture, sale, and use of Class Vehicles with the Roof Defect, which Ford failed to adequately investigate, disclose, and remedy, and its misrepresentations and omissions regarding the safety and reliability of the Class Vehicles.

354.     Ford's actions as set forth above occurred in the conduct of trade or commerce.

355.     Ford's actions impact the public interest because Plaintiff and the Class Members were injured in the same way as tens of thousands of others purchasing and/or leasing Ford's Super Duty Vehicles as a result of Ford's generalized course of deception. All of the wrongful conduct alleged herein occurred, and continues to occur, in the conduct of Defendant's business.

63

356.    Plaintiff and Class Members were injured as a result of Ford's conduct. Plaintiff and the Class Members overpaid for the Class Vehicles and did not receive the benefit of their bargain, and thus the Class Vehicles have suffered a diminution in value.

357.    Ford's conduct proximately caused the injuries to Plaintiff and the Class Members.

358.    Ford is liable to Plaintiff and the Class Members for damages in amounts to be proven at trial, including attorneys' fees, costs, and treble damages.

359.    Pursuant to Wash. Rev. Code. Ann. § 19.86.095, Plaintiff Bright will serve the Washington Attorney General with a copy of this complaint as Washington Plaintiffs seek injunctive relief.

### COUNT TWENTY-EIGHT — BREACH OF THE IMPLIED WARRANTY OF MERCHANTABILITY
### (REV. CODE WASH. § 62A.2-314/315)

360.    Plaintiff Bright realleges and incorporates by reference all paragraphs as though fully set forth herein.

361.    Plaintiff Bright asserts this claim on behalf of himself and the Washington Subclass against Defendant Ford.

362.    Ford is and was at all relevant times a merchant with respect to motor vehicles.

363.    A warranty that the Class Vehicles were in merchantable condition is implied by law in the instant transactions.

364.    The Class Vehicles, when sold and at all times thereafter, were not in merchantable condition and are not fit for the ordinary purpose for which cars are used. Specifically, the Class Vehicles are inherently defective in that the Roof Defect causes the passenger cab to be crushed by the weight of the Vehicle in the event of a rollover accident, causing serious injury or death to vehicle occupants.

365.    Privity is not required in this case because Plaintiff and the Class Members are intended third-party beneficiaries of contracts between Ford and its dealers; specifically, they are the intended

64

beneficiaries of Ford's implied warranties. The dealers were not intended to be the ultimate consumers of the Class Vehicles and have no rights under the warranty agreements provided with the Class Vehicles; the warranty agreements were designed for and intended to benefit the ultimate consumers only.

366.     As a direct and proximate result of Ford's breach of the warranties of merchantability, Plaintiff and the Class Members have been damaged in an amount to be proven at trial.

### COUNT TWENTY-NINE — FRAUD BY CONCEALMENT

367.     Plaintiff Bright realleges and incorporates by reference all paragraphs as though fully set forth herein.

368.     Plaintiff Bright asserts this claim on behalf of himself and the Washington Subclass against Defendant Ford.

369.     As set forth above, Ford concealed and/or suppressed material facts concerning the Class Vehicles' safety.

370.     Ford actively concealed and/or suppressed these material facts, in whole or in part, with the intent to induce Plaintiff and the Class Members to purchase the Class Vehicles at a higher price than their true value.

371.     Ford still has not made full and adequate disclosure of the Roof Defect.

372.     Plaintiff and the Class Members were unaware of these omitted material facts, and would not have acted as they did if they had known of the Roof Defect. Plaintiff and the Class Members' actions were justified. Ford had exclusive control of the material facts and such facts were not known to the public, Plaintiff Rains, or the Oregon Subclass.

373.     As a result of the concealment and/or suppression of the facts, Plaintiff and the Class Members sustained damage. For those of Plaintiff and the Class Members who elect to affirm the sale, these damages, include the difference between the actual value of that which Plaintiff and the Class Members paid and the actual value of that which they received, together with additional damages arising

65

from the sales transaction, amounts expended in reliance upon the fraud, compensation for loss of use and enjoyment of the property, and/or lost profits. For any Plaintiff and Class Member who wants to rescind their purchases, then such Plaintiff and Class Members are entitled to restitution and consequential damages.

374.    Ford's acts were done maliciously, oppressively, deliberately, with intent to defraud, and in reckless disregard of Plaintiff's and the Class Members' rights and well-being. Ford's conduct warrants an assessment of punitive damages in an amount sufficient to deter such conduct in the future, which amount is to be determined according to proof.

## COUNT THIRTY — UNJUST ENRICHMENT

375.    Plaintiff Bright realleges and incorporates by reference all paragraphs as though fully set forth herein.

376.    Plaintiff Bright asserts this claim on behalf of himself and the Washington Subclass against Defendant Ford.

377.    As a result of its wrongful and fraudulent acts and omissions, as set forth above, pertaining to the design and/or manufacturing defect of their vehicles and the concealment of the Roof Defect, Ford charged a higher price for their vehicles than the vehicles' true value and Ford obtained monies which rightfully belong to Plaintiff and the Class Members.

378.    Ford enjoyed the benefit of increased financial gains, to the detriment of Plaintiff and the Class Members, who paid a higher price for vehicles which actually had lower values. It would be inequitable and unjust for Ford retain these wrongfully obtained profits.

379.    Plaintiff Bright, therefore, seeks an order establishing Ford as a constructive trustee of the profits unjustly obtained, plus interest.

## VIII.   PRAYER FOR RELIEF

WHEREFORE, Plaintiff, individually and on behalf of the members of the Class, pray that this Court:

66

A.      Determine that the claims alleged herein may be maintained as a class action under Rule 23 of the Federal Rules of Civil Procedure, and issue an order certifying the Nationwide Class and State Subclasses as defined above;

B.      Appoint Plaintiffs as representatives of the Nationwide Class and applicable State Subclasses and their counsel as Class Counsel;

C.      Award all actual, general, special, incidental, consequential, punitive, and exemplary damages and restitution to which Plaintiffs and Class Members are entitled;

D.      Award all pre- and post-judgment interest on any monetary relief;

E.      Grant appropriate injunctive relief, including an order requiring Defendant to permanently and completely repair the Class Vehicles pursuant to its obligations under an implied warranty of merchantability;

F.      Determine that Ford is financially responsible for all Class notice and administration of Class relief;

G.      Award reasonable attorney fees and costs; and

H.      Grant such further relief that this Court deems appropriate.

## IX.      DEMAND FOR JURY TRIAL

Plaintiff hereby demands a jury trial for all claims so triable.

DATED this 17th day of November, 2022.

KELLER ROHRBACK L.L.P.

By */s/ Matthew J. Preusch*
         Matthew J. Preusch (CSB No. 298144)
         **KELLER ROHRBACK L.L.P.**
         801 Garden Street, Suite 301
         Santa Barbara, CA 93101
         mpreusch@kellerrohrback.com
         (805) 456-1496, Fax (805) 456-1497

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

Gretchen Freeman Cappio *(pro hac vice forthcoming)*
Ryan McDevitt *(pro hac vice forthcoming)*
Adele Daniel *(pro hac vice forthcoming)*
Emma Wright *(pro hac vice forthcoming)*
**KELLER ROHRBACK L.L.P.**
1201 Third Avenue, Suite 3200
Seattle, WA 98101
(206) 623-1900, Fax (206) 623-3384
gcappio@kellerrohrback.com
rmcdevitt@kellerrohrback.com
adaniel@kellerrohrback.com
ewright@kellerrohrback.com

***Attorneys for Plaintiff***

4873-9650-9236, v. 8

# EXHIBIT A

## 2015 FORD
# SUPER DUTY

The 2015 Ford F-Series Super Duty features best-in-class horsepower and fifth-wheel/gooseneck towing.* Its available second-generation 6.7-liter Power Stroke® V8 turbo diesel engine produces 440 horsepower and 860 lb.-ft. of torque.

*When properly equipped. Class is full-size pickups over 8,500 lbs. GVWR.



### PRODUCT HIGHLIGHTS

- Second-generation 6.7-liter Power Stroke V8 turbo diesel

- High-capacity tow package on F-350 allows 35,000-pound gross combined capacity weight rating and up to 26,500 pounds fifth-wheel/gooseneck towing

- Commercial-grade wheels, tires and brakes, upgraded U-joints and suspension on F-450 pickup truck allow 40,400-pound gross combined weight rating and up to 31,200 pounds gooseneck towing

**Engines:** 6.2-liter gasoline V8; 6.7-liter Power Stroke V8 turbo diesel

**Transmission:** Six-speed TorqShift® automatic

**Series:** XL, XLT, Lariat, King Ranch, Platinum

**Production location:** Kentucky Truck Plant, Louisville, Kentucky

**MSRP:** Starting at $31,045, plus $1,195 destination and delivery, and taxes

### SAFETY

- AdvanceTrac® with Roll Stability Control™ (single-rear-wheel axle only)
- MyKey® programmable vehicle key
- Energy management system pretensioning for height-adjustable front-row safety belts
- LATCH (Lower Anchors and Tether Anchors for Children)

### POWER STROKE

The Ford-built 6.7-liter Power Stroke V8 features a compacted graphite iron engine block. This material helps reduce weight and increase strength.



Quality



### LCD SCREEN

The available instrument cluster features a driver-configurable 4.2-inch productivity screen, which provides six primary menu options, including information on fuel economy, towing and more. Truck apps and off-road data are available on single-rear-wheel models only.



Smart



**Did you know?** When properly equipped, F-450 has a maximum combined weight with its trailer and load capacity of 40,400 pounds. That's more than half the maximum weight of a semitrailer on most federal interstate highways.

For more information on the 2015 Ford Super Duty and other Ford Motor Company products and news, go to media.ford.com.



Go Further

1  Matthew J. Preusch (CSB No. 298144)
   **KELLER ROHRBACK L.L.P.**
2  801 Garden Street, Suite 301
   Santa Barbara, CA 93101
3  (805) 456-1496, Fax (805) 456-1497
   mpreusch@kellerrohrback.com

4  *Attorney for Plaintiffs*
   *[Additional counsel listed on signature page]*

5

6                    UNITED STATES DISTRICT COURT
                     NORTHERN DISTRICT OF CALIFORNIA
7                      SAN FRANCISCO DIVISION

8  CURTIS BRIGHT, WILLIAM GRIFFITT,          No.
   DESMOND RAINS, IVAN TELLEZ, and
9  KEVIN THOMAS on behalf of themselves and  **CLRA VENUE AFFIDAVIT OF**
   all others similarly situated,            **PLAINTIFF IVAN TELLEZ**

10                              Plaintiffs,
   V.
11 FORD MOTOR COMPANY,

12                               Defendant.

13        I, Ivan Tellez, hereby declare and state as follows:

14        1.      I am over the age of 18 and a Plaintiff in this action. The facts contained in this

15 declaration are based on my personal knowledge and information that I have gathered and is available to

16 me, and if called upon to do so, I would testify to the matters stated herein.

17        2.      I make this affidavit as required by California Civil Code § 1780(d).

          3.      The complaint in this action is filed in the proper place for trial of this action because
18
   defendant Ford Motor Company, does business within the Northern District of California, and because
19
   substantial portion of the events, acts and omissions that are subject to my claims in this matter occurred
20
   within the Northern District of California, in Contra Costa County.
21
                                              1
   CLRA VENUE AFFIDAVIT OF IVAN TELLEZ

1

2

I declare under penalty of perjury under the laws of the State of California and the United States that the foregoing is true and correct.

3

4

Executed this 16th day of November, 2022 at Concord, California.

5

6

Ivan Tellez

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

2

CLRA VENUE AFFIDAVIT OF IVAN TELLEZ